**FANTASYLAND VIDEO, INC., Plaintiff,**

**v.**

**COUNTY OF SAN DIEGO, Defendant.**

**Tollis, Inc. and 1560 N. Magnolia Ave., LLC, Plaintiffs,**

**v.**

**County of San Diego, Defendant.**

**Nos. CIV. 02CV1909–LABRBB, CIV. 02CV2023–LABRBB.**

United States District Court, S.D. California.

June 14, 2005.

Clyde F De Witt, Weston Garrou and DeWitt, Los Angeles, CA, for Fantasyland Video, Inc., plaintiff.

Thomas Dale Bunton, County of San Diego Office of County Counsel, San Diego, CA, for County of San Diego, defendant.

A Dale Manicom, Law Office of A Dale Manicom, San Diego, CA, for Tollis Inc, movant.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; INJUNCTION; and ORDER TO SHOW CAUSE**

BURNS, District Judge.

In their respective complaints, plaintiffs allege certain amendments to San Diego County ordinances regulating adult entertainment businesses violate their rights under the federal and California constitutions. Before the Court are plaintiffs' Joint Motion for Summary Judgment and defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment. The parties also filed opposing and reply papers, as well as a joint statement of undisputed facts, almost 2,000 pages of legislative record, and over 700 pages of declarations and exhibits. Defendant also filed evidentiary objections.[1] Although the parties requested oral argument, the Court finds the issues in both motions appropriate for decision on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons discussed below, plaintiffs' Joint Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. As specified more fully below, the Court finds

---

1. To the extent the objections are not ad- dressed below, they are overruled.

unconstitutional certain procedural provisions of the ordinance amendments pertaining to licensing and zoning regulations.

### Background

In June 2002, the San Diego County Board of Supervisors passed Local Ordinance No. 9469, entitled "An Ordinance Amending the San Diego County Zoning Ordinance Relating to Adult Entertainment Establishments;" and Local Ordinance No. 9479, entitled "An Ordinance Amending the San Diego County Code of Regulatory Ordinances Relating to the Licensing and Regulation of Adult Entertainment Establishments." (Legislative Record ("LR"), at 15–32, 139–75.) Both of these ordinances were effective in July 2002.

Plaintiffs filed two separate complaints against San Diego County ("County") which have been consolidated. (Order filed Aug. 5, 2004, at 2, 5.) Plaintiff Tollis, Inc. owns property at 1560 N. Magnolia Avenue in the Pepper Drive/Bostonia area of San Diego County, which it leases to plaintiff 1560 N. Magnolia Ave., LLC. At this location, plaintiff 1560 N. Magnolia Ave., LLC operates a business called Deja Vu, which sells sexually explicit books, magazines, and novelties. Deja Vu also wants to offer live nude dancing at this location. It acquired its present location before the amendments went into effect, after obtaining the operating permit, and on the contingency it could offer nude entertainment. Hereafter, these plaintiffs will be referred to collectively as Deja Vu. Plaintiff Fantasyland Video, Inc. ("Fantasyland") operates a business at 1157 Sweetwater Road in the Spring Valley area of San Diego County, which includes an "Adult Arcade/Peep Show," an "Adult Bookstore," an "Adult Novelty Store," and an "Adult Video Store." (Jt. Stmnt of Facts, 4.)

In their complaints, plaintiffs seek a declaration the amendments to local ordinances which affect either the location or the activities conducted by their businesses violate their right to free speech provisions of the First Amendment. In addition, they seek an injunction prohibiting the enforcement of the amendments against them. Deja Vu also argues the amendments violate the California Constitution, and seeks damages arising out of the County's threat to enforce the amendments.

Although they filed a Joint Motion for Summary Judgment, each of the plaintiffs challenges only those portions of the amendments affecting their particular businesses. Plaintiffs' Joint Motion seeks summary judgment "in the form of an order enjoining the County from enforcing" the ordinances as amended because they are unconstitutional. The County's Motion seeks summary judgment in its favor on the ground all amendments to the ordinances are constitutional and enforceable against plaintiffs.

### Discussion

### I. Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001).

The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the nonmoving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *see also Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir.1998).

If the movant meets his burden, the burden shifts to the nonmovant to show summary adjudication is not appropriate. *Celotex*, 477 U.S. at 317, 324, 106 S.Ct. 2548. The nonmovant does not meet this burden by showing "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986). The "mere scintilla of evidence in support of the nonmoving party's position is not sufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Accordingly, the nonmoving party cannot oppose a properly supported summary adjudication motion by "rest[ing] on mere allegations or denials in his pleadings." *Id.* at 256, 106 S.Ct. 2505. The nonmovant must go beyond the pleadings to designate specific facts showing there are genuine factual issues which "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

In considering the motion, the nonmovant's evidence is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate inferences are jury functions, and are not appropriate for resolution by the court on a summary judgment motion. *Id.*

In this case, the parties filed cross-motions regarding some of the same causes of action. As discussed below, the County bears the burden of proof at trial with respect to some issues raised by the cross-motions; with respect to other issues, the burden is on plaintiffs. The mere fact the parties filed cross-motions "does not necessarily mean there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir.1975). "[E]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001).

When proper grounds for granting summary judgment have not been established, "[s]ummary adjudication may be appropriate on clearly defined, distinct issues."

*FMC Corp. v. Vendo Co.*, 196 F.Supp.2d 1023, 1029 (E.D.Cal.2002) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir.1990)). "An order under Rule 56(d) narrows the issues and enables the parties to recognize more fully their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives." *FMC Corp.*, 196 F.Supp.2d at 1029–30 (citing 10B Wright & Miller, Federal Practice and Procedure (3d ed.1998), § 2737 at 316–18). Specifically, Rule 56(d) empowers the court to "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted" and to "mak[e] an order specifying the facts that appear without substantial controversy, and direct[ ] such further proceedings in the action as are just."

## II. Summary of Applicable First Amendment Principles and Burdens of Proof

The parties dispute the legal standard and burdens of proof applicable to time, place, and manner restrictions regulating adult entertainment businesses after *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). Since this standard applies to many issues raised by the cross-motions, the Court addresses it in detail below.

■ The general rule is "[l]aws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." *United States v. Playboy Entm't Group*, 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). "In general, where a plaintiff claims suppression of speech under the First Amendment, the plaintiff bears the initial burden of proving that speech was restricted by the governmental action in question." *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 n. 4 (9th Cir.

2000). It is beyond question sexually-oriented speech enjoys some protection under the free speech provisions of the First Amendment. *Playboy*, 529 U.S. at 812–17, 120 S.Ct. 1878. Although neither party expressly discusses the issue whether the County's amendments restrict protected speech; the undisputed underlying premise of their motions is that they do.

"The burden then shifts to the defendant governmental entity to prove that the restriction in question is constitutional." *Lim*, 217 F.3d at 1054 n. 4. The government cannot ban sexually-oriented speech altogether but can place restrictions on it so long as the restrictions satisfy one of two standards. The purpose or justification behind the law in question is the key to determining which of the two standards applies.

■ If the law is designed to have a direct impact by restricting speech because of the content of the speech and because of the effect the speech may have on its listeners, the law is referred to as a content-based restriction, and the government bears an especially heavy burden to overcome a First Amendment challenge. *Playboy*, 529 U.S. at 812–17, 120 S.Ct. 1878. A content-based speech restriction can survive a First Amendment challenge only if "it satisfies strict scrutiny," which requires the government not only to identify and establish a compelling interest but also to explain why a less restrictive provision would not be as effective. *Id.* at 813, 817, 120 S.Ct. 1878.

■ On the other hand, if the law is content-neutral, and its restrictions on sexually-oriented speech are primarily justified not by the concern for the effect of the subject matter on listeners, but by reducing negative secondary effects associated with the speech, it is subject to the intermediate level of scrutiny, which is highly deferential to the government. *City of*

*Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The parties in this case do not dispute the intermediate scrutiny, rather than strict scrutiny, applies.

■ Content-neutral time, place, and manner restrictions are constitutional under intermediate scrutiny even if they restrain speech, so long as they meet three requirements. First, the restriction must be "content-neutral." This means the restriction can be justified without reference to the content of the speech. A restriction can be justified without reference to the content of the speech if the "predominate intent" behind the restriction is not to suppress the speech but to "serve a substantial government interest," such as preventing crime or combating "the undesirable secondary effects" of businesses which "purvey sexually explicit materials." *Renton,* 475 U.S. at 48–49, 106 S.Ct. 925. If so justified, restrictions which specifically target or treat adult businesses differently from other types of businesses can be content-neutral. *Id.* at 47–48, 106 S.Ct. 925.

Second, the restriction must be "narrowly tailored" to "serve a substantial government interest." *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925. In *Renton,* for example, a zoning ordinance, which required adult movie theaters to be located at least 1,000 feet from residential zones, churches, parks, and schools, was held narrowly tailored and constitutional. *Id.* at 43, 106 S.Ct. 925. The ordinance was considered "narrowly tailored" because it did not apply to all theaters but was designed "to affect only that category of theaters shown to produce the unwanted secondary effects." *Id.* at 52, 106 S.Ct. 925. And this form of selectivity is constitutionally permissible; a time, place, and manner restriction affecting protected speech can be "under-inclusive." *Id.* In other words, the government does not have to attempt to address all of its interests at one time. *Id.* at 52–53, 106 S.Ct. 925. The location restriction in *Renton* only applied to adult theaters and not to other types of adult businesses. This was and is permissible because the government "must be allowed a reasonable opportunity to experiment with solutions" and can, for example, choose to single out and place limitations on "one particular kind of adult business." *Id.* (internal quotation marks and citation omitted). Furthermore, the government has broad discretion in selecting a method "to further its substantial interests." *Id.* at 52, 106 S.Ct. 925. It may, for example, "regulate adult theaters by dispersing them" or "by effectively concentrating them" in the same area. *Id.*

Third, the restriction must allow "for reasonable alternative avenues of communication." *Renton,* 475 U.S. at 50, 52, 106 S.Ct. 925. The "overriding concern is that a city cannot 'effectively deny adult businesses a reasonable opportunity to open and operate within the city.'" *Diamond v. City of Taft,* 215 F.3d 1052, 1056 (9th Cir.2000) (quoting *Renton,* 475 U.S. at 54, 106 S.Ct. 925) (internal alterations omitted). An adult business is given a reasonable opportunity to relocate, if the potential relocation sites "may be considered part of an actual business real estate market," and if "there are an adequate number of potential relocation sites for already existing businesses." *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1530 (9th Cir.1993). "That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." *Renton,* 475 U.S. at 54, 106 S.Ct. 925.

■ Although the burden of proof with respect to these requirements is on the government, the burden is not difficult to meet. *See, e.g., World Wide Video, Inc. v.*

*City of Spokane,* 368 F.3d 1186, 1196 (9th Cir.2004), 2004 U.S.App.Lexis 10443, 2005 WL 1429810, 2004 U.S.App. LEXIS 14381 and 2005 WL 1429810, 2004 U.S.App. LEXIS 18927 (referring to the standard set forth in *Renton* and *Alameda Books* as "very little evidence standard"). The government is not required to meet "an unnecessarily rigid burden of proof" to justify the restriction and may rely on general experiences, findings, and studies completed by other local governments, including those reflected in judicial opinions:

> [The government] was entitled to rely on the experiences of ... other cities, and in particular on the "detailed findings" summarized in [a judicial] opinion, in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

*Renton,* 475 U.S. at 50, 51–52, 106 S.Ct. 925: *see also City of Erie v. Pap's A.M.,* 529 U.S. 277, 296–97, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (reliance on judicial opinions discussing secondary effects of similar activities or establishments is reasonable).

Plaintiffs believe the highly deferential standard set forth in *Renton* was modified in their favor by *Alameda Books.* They argue the government is no longer entitled to the "extreme deference" articulated in *Renton.*

Plaintiffs' argument is based on a misreading of Justice Kennedy's concurring opinion in *Alameda Books.* Although Justice Kennedy's concurrence "may be regarded as the controlling opinion," because there was no majority opinion, it did not work a fundamental shift in the *Renton*

analysis. *See Ctr. for Fair Pub. Policy v. Maricopa County,* 336 F.3d 1153, 1161–62 (9th Cir.2003) (citing *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.")). Justice Kennedy disavowed any interpretation which would fundamentally change the *Renton* standard. *Alameda Books,* 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring) ("the central holding of *Renton* is sound"). He agreed with the plurality laws "designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." *Id.* The plurality considered his opinion "simply a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manner regulation and not a ban." *Id.* at 443, 122 S.Ct. 1728. Accordingly, Justice Kennedy's concurring opinion was not "meant to precipitate a sea change in this particular corner of First Amendment law," as suggested by plaintiffs. *See Ctr. for Fair Pub. Policy,* 336 F.3d at 1162.

In *Alameda Books,* the Supreme Court granted *certiorari* to "clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton.*" *Alameda Books,* 535 U.S. at 433, 122 S.Ct. 1728. The plurality opinion noted the *Renton* standard is not intended to mean a government "can get away with shoddy data or reasoning." *Id.* at 438, 122 S.Ct. 1728. The focus of many of plaintiffs' arguments in this case is the reference to "shoddy data"—they argue the reports and other evidence relied on by the County in amending its ordinances are "shoddy" and do not support the Coun-

ty's rationale for the new restrictions on their businesses. In addition, *Alameda Books* set forth a shifting burden of proof:

> The [government's] evidence must fairly support the [government's] rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the [government's] evidence does not support its rationale or by furnishing evidence that disputes the [government's] factual findings, the [government] meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a [government's] rationale in either manner, the burden shifts back to the [government] to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 438–39, 122 S.Ct. 1728. In this regard, plaintiffs argue their evidence is at the very least sufficient to "cast direct doubt" on the County's rationale for the amendments, thereby shifting the burden to the County to supplement the record.

Plaintiffs interpretation of *Alameda Books* as raising the government's evidentiary bar is unsupported by its holding, and was expressly rejected by the plurality and Justice Kennedy's concurrence, which noted "very little evidence is required" for the government to meet its burden. *Alameda Books*, 535 U.S. at 451, 122 S.Ct. 1728. Given the low level of evidence required for the government to properly support a content-neutral ordinance, and the high level of deference it is afforded, the plaintiff's burden to "cast direct doubt" on the government's rationale is very high. *See World Wide Video*, 368 F.3d at 1195–96; *Ctr. for Fair Pub. Policy*, 336 F.3d at 1168.

### III. *Hours–of–Operation Restriction*

#### A. *The First Amendment Claim*

■ In their respective operative complaints, all plaintiffs challenge on First Amendment grounds the new hours-of-operation restriction, which states as follows:

> It shall be unlawful for any owner, operator, manager or employee of an adult entertainment establishment to allow such establishment to remain open for business between the hours of 2:00 a.m. and 6:00 a.m. of any day excepting herefrom an adult hotel/motel.

(LR, at 154 [Ordinance No. 9479, § 21.1809].) The County moves for summary judgment on plaintiffs' hours-of-operation claim, and all plaintiffs cross-move for summary judgment on this claim.

It is undisputed intermediate scrutiny applies to the hours-of-operation provision. Accordingly,

> [t]he familiar three-part analytical framework established in *Renton* applies. First, we must determine whether the regulation is a complete ban on protected expression. Second, we must determine whether the county's purpose in enacting the provision is the amelioration of secondary effects. If so, it is subject to intermediate scrutiny, and we must ask whether the provision is designed to serve a substantial government interest, and whether reasonable alternative avenues of communication remain available.

*Dream Palace v. County of Maricopa*, 384 F.3d 990, 1013 (9th Cir.2004) (internal citations omitted). Plaintiffs do not dispute the hours-of-operation restriction is content-neutral. Instead, they challenge whether the concerns the County aims to address constitute a substantial government interest, and whether the restriction leaves open reasonable alternative avenues of communication. Plaintiffs contend the County's evidence is insufficient to demonstrate a connection between the new provision and amelioration of negative secondary effects of adult entertainment businesses.

The County maintains the hours-of-operation restriction was intended to reduce negative secondary effects of excessive noise, traffic, disorderly conduct and crime during late night hours. In enacting the restriction, the County relied on evidence including twenty-eight studies from other jurisdictions regarding secondary effects of adult entertainment businesses, such as prostitution, public sexual activity, noise and unclean conditions (LR, at 443–1718, 1752–1833); experiences of other municipalities as reported in several judicial opinions (LR, at 6–17, 141–42, 1719–47); and local public testimony by fifteen witnesses (LR, at 1906 *et seq.*).[2] This record "compares favorably to the record found to pass muster" in *Center for Fair Public Policy and Dream Palace. See Dream Palace,* 384 F.3d at 1015. The type of evidence considered by the County has been held "reasonable and relevant" in other cases. *Id.* (quoting *Ctr. for Fair Public Policy,* 336 F.3d at 1168).

Furthermore, the County argues *Center for Fair Public Policy* bars plaintiffs' claim as a matter of law because it rejected a First Amendment challenge to a similar hours-of-operation restriction. Although *Center for Fair Public Policy* established a general proposition hours-of-operation restrictions may pass muster under the First Amendment, this does not relieve the Court of the duty to put the County to its proof in this case. *See Dream Palace,* 384 F.3d at 1012.

Plaintiffs do not contend the County failed to satisfy its initial burden of producing evidence which fairly supports the amendments. Instead, they argue their contrary evidence "cast[s] ample doubt on the County's proffered justification for its legislation," shifts the burden to the County to supplement the record with further justification, and raises a genuine issue of material fact sufficient to preclude summary judgment for the County. (Pls.' Joint Mot., at 1–3.) By presenting their own evidence, plaintiffs attempt to distinguish this case from *Center for Fair Public Policy.*

Specifically, plaintiffs mount a two-pronged attack on the County's evidence. First, they attempt to demonstrate the County's evidence does not support its rationale by pointing to the testimony of the County's own expert, Dr. Richard McCleary. *See Alameda Books,* 535 U.S. at 441, 122 S.Ct. 1728 (plurality opinion). Second, plaintiffs furnish evidence, a report and empirical studies of their expert Dr. Daniel Linz, which they contend disputes the County's evidence. *See id.* As discussed below, neither prong is sufficient as a matter of law to cast direct doubt on the County's evidence, raise a genuine issue of material fact in opposition to the County's summary judgment motion, or meet plaintiffs' burden as the moving parties on their own cross-motion.

Dr. McCleary testified "late-night crime is independent of adult entertainment businesses and rather derives from alcoholic beverage establishments and their patrons." (Pls.' Joint Reply, at 2.) Plaintiffs argue Dr. McCleary conceded there is no connection between late night crime and adult entertainment businesses or their patrons. (*Id.*) The Court has reviewed the entirety of Dr. McCleary's testimony submitted by both sides (Bunton Reply Decl., Ex. 18; Manicom Opp'n Decl., Ex. 3), and finds it does not support plaintiffs' argument. Furthermore, in the context of all the secondary effects the County sought to address, plaintiffs' argument, even if believed, is insufficient as a matter of law.

2. The County also indicated a willingness to supply the Court with additional studies and expert declarations, if the Court finds plaintiffs cast direct doubt on the County's rationale. (Def.'s Opp'n, at 7.)

Dr. McCleary testified there would still be an increase in crime "independent of any adult businesses" and even if all businesses were closed from 2:00 a.m. to 6:00 a.m. because "[c]riminals often operate during late night, early morning hours when witnesses and police are less likely to be present." (Bunton Reply Decl., Ex. 18, at 46–47.) However, he also testified businesses open between 2:00 a.m. and 6:00 a.m. are a "focus point for noise" because bar patrons tend to look for another place to go after the bars close at 1:00 a.m., and bar patrons who have consumed alcoholic beverages have been known to congregate outside adult businesses, resulting in noise complaints. (*Id.* at 33–34.) He indicated the hours restriction is justifiable because police resources are very strained during these hours, which results in added risks to public safety. (*Id.* at 41 *et seq.*) Furthermore, if fewer people are "out and about" during the late night hours because businesses are closed, it will be more difficult for "predatory criminals" to find victims, resulting in a reduction in crime. (*Id.* at 46–47.)

Even if the Court accepted plaintiffs' interpretation of Dr. McCleary's testimony to suggest late night crime is independent of adult entertainment businesses, it is insufficient to cast direct doubt on the County's evidence. To raise a genuine issue of material fact on summary judgment, a fact is material if it could affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Under Ninth Circuit law interpreting and applying the burden-shifting standard articulated in *Alameda Books*, plaintiffs must effectively controvert much, if not all, of the County's evidence, leaving less than "some evidence" on which the County could reasonably rely for the ordinance. *World Wide Video*, 368 F.3d at 1195–96 (affirming order granting the government's motion for summary judgment). As in *World Wide Video*, plaintiffs' argu-

ment here does not effectively controvert much of the County's evidence because the County relied on a voluminous legislative record, including numerous studies conducted by other municipalities, judicial opinions discussing similar secondary effects and public testimony, which plaintiffs do not address. Furthermore, plaintiffs' argument is targeted only toward evidentiary support addressing late night crime, and does not address the other targeted secondary effects such as late night noise, traffic and disorderly conduct. The County only needs "some evidence" to support its ordinance. *Id.* Accordingly, plaintiffs' first argument fails as a matter of law to cast direct doubt on the County's evidence.

Plaintiffs' second argument is based on Dr. Linz' report. Dr. Linz opined the reports cited by the County on the negative secondary effects of sexually-oriented businesses are unreliable because their methodology and empirical assumptions are flawed. He participated in a number of other relevant studies, which he claims do not suffer from "methodological flaws," and show sexually-oriented businesses are not causally related to crime. (Linz Decl., at 9.) In addition, Dr. Linz conducted "an empirical study" which examined "whether there is a greater incidence of crime in the vicinity of peep show establishments than in comparable control areas, and whether any secondary crime effects of peep show establishments in San Diego are disproportionately greater between the hours of 2 a.m. and 6 a.m." (*Id.* at 11.) He also completed "an empirical study of criminal activity surrounding adult businesses in San Diego County." (*Id.* at 12.) Based on his own studies, Dr. Linz opined there is "no evidence that the adult businesses examined in the study are associated in any way with the clustering of crimes against persons. . . ." (*Id.*)

Plaintiffs point out Dr. Linz' approach was accepted by other courts in cases involving successful challenges to municipal ordinances. *See Ramos v. Town of Vernon*, 353 F.3d 171 (2nd Cir.2003); *Hodgkins v. Peterson*, 2004 U.S. Dist. LEXIS 16359 (S.D.Ind.); *J.L. Spoons, Inc. v. Morckel*, 314 F.Supp.2d 746 (N.D.Ohio 2004). These cases, however, are distinguishable. *Ramos* and *Hodgkins* did not involve adult entertainment businesses. They addressed juvenile curfew ordinances, and were analyzed under a different legal standard. *Ramos*, 353 F.3d at 176–84 (applying equal protection intermediate scrutiny to a curfew restriction on to minors' right to intrastate travel); *Hodgkins*, 2004 U.S. Dist. LEXIS 16359 (applying strict scrutiny to parental rights issue). Although *J.L. Spoons* involved an adult entertainment ordinance, the plaintiffs presented a facial overbreadth challenge, and the court did not apply *Alameda Books* but *Triplett Grille v. City of Akron*, 40 F.3d 129, 132 (6th Cir.1994). None of these cases is therefore helpful in analyzing whether plaintiffs cast direct doubt on the County's evidence following *Alameda Books*.

On the other hand, Dr. Linz' approach was unsuccessful in pertinent cases. *See Pap's*, 529 U.S. at 300, 120 S.Ct. 1382; *Alameda Books*, 535 U.S. at 439, 122 S.Ct. 1728 (plurality opinion); *Nite Moves Entm't. Inc. v. City of Boise*, 153 F.Supp.2d 1198, 1208–09 (D.Idaho 2001). In *Pap's*, *amicus curiae* relied on Dr. Linz' study, and apparently suggested when secondary effects are amenable to empirical treatment, the government's non-empirical evidence should be discounted, and an empirical analysis should be required. 529 U.S. at 314–15 n. 3, 120 S.Ct. 1382 (Souter, J., dissenting). The majority opinion rejected this idea. *Id.* at 300, 120 S.Ct. 1382. As in this case, in *Alameda Books*, *amicus curiae* criticized the studies relied upon by the City of Los Angeles. 535 U.S. at 453–54 n. 1, 122 S.Ct. 1728 (Souter, J., dissenting). Again, the plurality rejected the idea and noted the governments have never been required to demonstrate with empirical data their ordinances will successfully lower crime. *Id.* at 439, 122 S.Ct. 1728.

Plaintiffs' argument is similar to the one considered and rejected by the Seventh Circuit in *G.M. Enterprises v. Town of St. Joseph*, 350 F.3d 631 (7th Cir.2003). Along with other evidence contrary to the government's position, those challenging the ordinance submitted a study and declaration by Dr. Linz that attacked the methodology employed in the studies relied upon by the government. *Id.* at 635–36. The Seventh Circuit concluded this was just "some evidence that might arguably undermine the [government's] inference of the correlation of adult entertainment and adverse secondary effects. . . ." *Id.* at 639. It concluded "some evidence" was not enough:

Although this evidence shows that the [government] might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the [government's] legislative process. [¶] *Alameda Books* does not require a court to reweigh the evidence considered by a legislative body, nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community, so long as the regulatory body has satisfied the *Renton* requirement that it consider evidence "reasonably believed to be relevant to the problem" addressed.

*Id.* at 639–40 (quoting *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925); *see also Alameda Books*, 535 U.S. at 440, 122 S.Ct. 1728 (plurality opinion) (acknowledging the local

legislative body "is in a better position than the Judiciary to gather and evaluate data on local problems"), 445 (Kennedy, J., concurring) ("as a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. . . . [t]he [local legislative body] knows the streets of [the city] better than we do").

The Seventh Circuit's analysis in *G.M. Enterprises* is consistent with the Ninth Circuit's analysis in *World Wide Video.* As discussed above, to successfully cast direct doubt on the County's evidence, plaintiffs bear a heavy burden of effectively rebutting more than just some of the categories of permissible evidence relied upon by the County with respect to each targeted secondary effects. *See World Wide Video,* 368 F.3d at 1195–96. So long as some evidence remains upon which the County reasonably relied, plaintiffs fail to cast direct doubt. *See id.* Although Dr. Linz' study and opinion purport to contradict some of the County's secondary effect evidence, plaintiffs' argument in this regard suffers from some of the same fatal infirmities as their first argument based on Dr. McCleary's testimony. It addresses only the reports from other municipalities, but does not address the judicial opinions and public testimony which the County also considered. In addition, it is directed only toward late night crime, and does not address the remaining secondary effects the County targeted.

As plaintiffs' evidence is insufficient as a matter of law to cast direct doubt on the County's evidence, plaintiffs fall short of meeting their burden to raise a genuine issue of material fact in opposition to the County's summary judgment motion with respect to the new hours-of-operation restriction. *A fortiori,* plaintiffs also fail to meet their burden as the moving parties on their cross-motion. Therefore, the County's motion for summary judgment of

this issue is granted, and plaintiff's cross-motion is denied.

### B. The California Constitution Claim

▮ Plaintiffs move for summary judgment of their hours-of-operation restriction claim to the extent it is based on the California Constitution, and the County counters on the same claim. Relying on the California Supreme Court's decision in *People v. Glaze,* 27 Cal.3d 841, 166 Cal. Rptr. 859, 614 P.2d 291 (1980), plaintiffs argue the new hours-of-operation restriction violates Article I, Section 2, of the California Constitution. The County argues the pertinent portion of *Glaze* is no longer good law, and the ordinance at issue therein is distinguishable in several material respects. A review of the cases cited by the parties reveals the County is correct.

In *People v. Glaze,* the California Supreme Court held invalid under the California Constitution an ordinance which required picture arcades to be closed between 2:00 a.m. and 9:00 a.m. 27 Cal.3d at 843–44, 849, 166 Cal.Rptr. 859, 614 P.2d 291 (1980). The purpose of the hours-of-operation restriction was to "prevent masturbation during those hours when law enforcement problems are greatest." *Id.* at 847, 166 Cal.Rptr. 859, 614 P.2d 291. The court found:

[C]rime in the streets could be reduced by prohibiting all persons from going out in public. However, when fundamental liberties are at stake, the test in a free society is whether there are "less drastic means" available to accomplish the government's purpose . . . . The government may deal directly with masturbation in public picture arcades by persons who know or should know of the presence of others who may be offended by such conduct by arresting and prose-

cuting them . . . . The record before this court fails to show either that criminal activity is particularly acute at picture arcades or that it is prevalent between the hours of 2 a.m. and 9 a.m.

*Id.* at 847–48, 166 Cal.Rptr. 859, 614 P.2d 291.

The *Glaze* ordinance is distinguishable. First, preventing masturbation was the only reason for the hours-of-operation restriction, while here the County has different and multiple reasons for its restriction. Second, the *Glaze* ordinance applied to all arcades and not just to those where masturbation was likely to be a problem, while the County's ordinance applies only to adult entertainment businesses. Last, the *Glaze* ordinance required arcades to be closed three more hours per day than the County's ordinance.

More importantly, however, *Glaze* is not controlling because it applied a higher standard than necessary: strict, rather than intermediate, scrutiny. *Id.* at 848–49, 166 Cal.Rptr. 859, 614 P.2d 291. As already noted, the United States Supreme Court established in *Renton* that intermediate level of scrutiny should be applied when analyzing restrictions on sexually-oriented speech. 475 U.S. at 46–49, 106 S.Ct. 925. Following *Renton*, the California Supreme Court held the time, place, and manner test under the free speech provisions of the California Constitution are analyzed under federal constitutional standards:

> [O]ur formulation of the time, place, and manner test was fashioned from a long line of United States Supreme Court cases, and . . . analysis of speech regulation under article I, section 2(a), employs time, place, and manner restrictions measured by federal constitutional standards. The high court continues to employ the same formulation set out above in its time, place, and manner inquiry.

*Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal.4th 352, 364 n. 7, 93 Cal.Rptr.2d 1, 993 P.2d 334 (2000) (internal quotation marks, citations and alterations omitted). Given these developments in California law, and the Court's finding the County's hours-of-operation restriction meets federal constitutional standards, plaintiffs' summary judgment motion as to the same claim under the California Constitution is denied, and the County's cross-motion is granted.

## IV. Interior Configuration (Open–Booth) Requirement

Plaintiff Fantasyland operates an "adult bookstore and arcade." (Andrus Decl., at 2.) The rear portion of the store contains peep show booths (*i.e.,* "small, private viewing areas, each of which has a currency-operated device that facilitates the viewing of adult motion pictures"). (*Id.* at 3.) The peep show booths are "designed to accommodate only one customer at a time" and currently have "lockable doors on them." (*Id.* at 5.)

■ Fantasyland's complaint challenges two specific requirements of the amended ordinance, which apply to the peep show booths. In pertinent part, the amendment prohibits any "door, curtain, or obstruction of any kind [to] be installed within the entrance to a peep show booth." (LR, at 157 [Ordinance No. 9479, § 21.1816(2) ].) Another challenged portion of the amendment states as follows:

> No person shall operate a peep show unless a manager is on duty to ensure its lawful operation and is located at a manager's station which has an unobstructed view of the entrance to each peep show booth.

(*Id.* at 158 [§ 21.1819].) The County moves for summary judgment on Fantasyland's First Amendment claim that these provisions, referred to jointly as "open-booth

requirement," violate the First Amendment. Fantasyland cross-moves for summary judgment on the same claims.

Fantasyland acknowledges "regulations comparable to this one have been upheld in this circuit." (Pls.' Joint Mot., at 10.) However, it argues these decisions are not necessarily controlling because of the Supreme Court's more recent decision in *Alameda Books.* Based in large part on *Alameda Books,* Fantasyland contends it is entitled to summary judgment in its favor on this issue for three main reasons. First, it argues the open-booth requirement unconstitutionally reduces the secondary effects by reducing or chilling protected speech. Second, it contends the County relied on "shoddy" evidence to support its rationale for the open-booth requirement, and Fantasyland's evidence casts direct doubt on this rationale. Third, Fantasyland claims the open-booth requirement is not narrowly tailored.

### A. Rationale for the Amendment

Fantasyland argues the open-booth requirement will address the secondary effects targeted by the County's amendment by significantly and impermissibly reducing or chilling speech because most customers will not want to view adult movies inside the booths when they no longer offer privacy. (Andrus Decl., at 5.) Fantasyland relies on Justice Kennedy's comment in his concurring opinion in *Alameda Books:* "Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, this is not a permissible strategy." 535 U.S. at 445, 122 S.Ct. 1728.

Justice Kennedy concurred in the judgment but filed a separate opinion in pertinent part because "the plurality's application of *Renton* [to the facts of *Alameda Books* ] might constitute a subtle expansion, with which [he did] not concur." *Id.* (Kennedy, J., concurring). He was con-

cerned the analysis did not sufficiently take into account the effect of the challenged ordinance on speech, *i.e.,* the proportionality. At the outset, the government should advance some rationale or basis for a belief "that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." *Id.* at 449, 122 S.Ct. 1728.

As discussed above, to the extent Fantasyland interprets the concurring opinion as working a fundamental shift in the *Renton* analysis, it is mistaken. *See Alameda Books,* 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring); *Ctr. for Fair Pub. Policy,* 336 F.3d at 1162. In *Center for Fair Public Policy,* the Ninth Circuit rejected an argument similar to the one Fantasyland makes here. The plaintiffs argued an hours-of-operation restriction reduced the secondary effects simply by reducing speech because the patrons prefer to frequent adult entertainment businesses during late night hours, and the ordinance prohibited their operation at that time. *Ctr. for Fair Pub. Policy,* 336 F.3d at 1162. The court disagreed because accepting the plaintiff's argument "cannot be squared with [Justice Kennedy's] insistence that the central holding of *Renton* remains sound." *Id.* (internal quotation marks and citations omitted).

This is apparent from the example Justice Kennedy offered to clarify his point:
> If two adult businesses are under the same roof, and ordinance requiring them to separate will have one of two results: One business will either move elsewhere or close. The city's premise cannot be the latter. It is true that cutting adult speech in half would probably reduce secondary effects proportionally. But ... a promised proportional reduction does not suffice.... [¶] The premise ... must be that businesses ... will for the

most part disperse rather than shut down.

*Alameda Books,* 535 U.S. at 451, 122 S.Ct. 1728. Accordingly, the proportionality inquiry goes to the government's premise or rationale for the ordinance, which cannot be to reduce secondary effects by reducing speech. *Id.* at 449, 122 S.Ct. 1728 ("what proposition does a city need to advance in order to sustain a secondary-effects ordinance"), 451 ("[o]nly after identifying the proposition to be proved can we ask the second part of the question presented: is there sufficient evidence to support the proposition?"). Whether there is sufficient evidence to support the rationale is a separate inquiry. *Id.* at 451, 122 S.Ct. 1728.

In the amended ordinance, the County stated its purpose as:

> It is the purpose of this ordinance to regulate adult entertainment establishments in order to promote health, safety and general welfare of the citizens of the County, and to establish reasonable and uniform regulations to prevent the deleterious effects of adult entertainment establishments within the County. The provisions of this ordinance have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials.

(LR, at 140–41 [Ordinance No. 9479, § 21.1801(A) ].) With the open-booth requirement specifically, the County sought to prevent unlawful sexual activities between patrons and the resulting spread of sexually-transmitted diseases. (LR, at 499–503, 1277–78, 1310, 1313, 1316–17, 1541.) Nothing in the record, including Fantasyland's evidence, suggests the premise was to preclude patrons from viewing peep shows.

Fantasyland relies on the declaration of William H. Andrus, Vice President of Fantasyland and its parent company, who has been closely involved with the development and operation of at least fifty similar businesses in the United States. Mr. Andrus offered his observations based on extensive experience that a change from private to open viewing areas causes an immediate drop in the amount of viewing "typically to roughly 40% of what it was prior to the change," because "most customers disfavor viewing sexually oriented motion pictures in an open setting." (Andrus Decl., at 5.) Fantasyland argues Mr. Andrus' declaration proves the open-booth requirement will significantly reduce speech. As discussed above, this is not the relevant inquiry. The relevant inquiry is whether reducing speech was the premise for the open-booth requirement. Mr. Andrus' declaration does not speak to this inquiry.

In any event, an open-booth requirement does not reduce speech because it does not limit what movies can be shown, and does not preclude anyone from using the booths as a means for viewing movies—patrons can continue to watch whatever movies they want in the open booths. *Ellwest Stereo Theatres. Inc. v. Wenner,* 681 F.2d 1243, 1247 (9th Cir.1982). Other circuits have also found open-booth requirements to be constitutional time, place, and manner restrictions which do not substantially reduce speech. *See, e.g., Pleasureland Museum, Inc. v. Beutter,* 288 F.3d 988, (7th Cir.2002); *Matney v. County of Kenosha,* 86 F.3d 692, (7th Cir.1996); *Bamon Corp. v. City of Dayton,* 923 F.2d 470, 473 (6th Cir.1991); *Doe v. City of Minneapolis,* 898 F.2d 612, 617 (8th Cir. 1990).

To the extent Fantasyland's argument is based on the economic effect the open-booth requirement will have on its business, it is not constitutionally cognizable. *See Spokane Arcade, Inc. v. City of Spokane,* 75 F.3d 663, 665 (9th Cir.1996). As long as there is no "absolute bar to the

market ..., it is irrelevant whether '[a regulation] will result in lost profits, higher overhead costs, or even prove to be commercially unfeasible for an adult business.'" *Id.* at 666 (alteration in the original) (quoting *Walnut Properties v. City of Whittier,* 861 F.2d 1102, 1109 (9th Cir. 1988)); *see also Matney,* 86 F.3d at 700. Accordingly, Mr. Andrus' declaration is insufficient to raise a material issue of fact. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Based on the foregoing, Fantasyland's argument is unsupported by relevant evidence and fails as a matter of law.

### B. Evidentiary Support for the Amendment

Fantasyland next argues the County lacks sufficient evidence in support of its open-booth requirement. The main purpose for the requirement is to prevent unlawful sexual activities between patrons on the premises of adult arcades, and to prevent the resulting spread of sexually-transmitted diseases. To support its rationale for the open-booth requirement, the County cites to a number of studies and reports in the Legislative Record demonstrating the prevalence of unlawful sexual activities between patrons inside the closed booths and "glory holes"[3] between the booths. (LR, at 499–503, 1277–78, 1310, 1313, 1316–17, 1541.) According to the County, these studies show unprotected sex is common in adult entertainment establishments, which promotes the spread of sexually-transmitted diseases. (Def.'s Mot., at 22 n. 15.) Fantasyland argues the County's evidence is shoddy because the proposition sexually-transmitted diseases could be transmitted by the semen left in the booths is not scientifically supported, and the County cited to no evidence crimi-

nal activity actually takes place in Fantasyland's booths.

Fantasyland believes the County's rationale for the open-booth requirement is "the transmission of disease with respect to residue from masturbation." (Pls.' Joint Mot., at 10.) Dr. John M. Goldenring, Fantasyland's expert in public health and the transmission of diseases, including sexually-transmitted diseases, reviewed the relevant portions of the Legislative Record, and was not able "to find any support for the proposition that any sexually transmitted disease could be transmitted absent sexual contact." (Goldenring Decl., at 7–8.) According to Dr. Goldenring, absent direct sexual contact between the genitals of one person and the genitals, anus or mouth of another, "the likelihood of a [sexually transmitted disease] being transmitted by bodily fluids, such as semen, urine or saliva existing on surfaces is minute, nearly zero." (*Id.* at 5.) "Other contagious diseases, such as influenza, the common cold, and other viruses and bacterial infections are transmitted through saliva, but not semen or urine." (*Id.*)

Dr. Goldenring's declaration is insufficient as a matter of law to show the County relied on shoddy evidence. *See World Wide Video,* 368 F.3d at 1195–96. Contrary to Fantasyland's assumption, the record indicates the open-booth requirement is not intended to prevent the transmission of communicable diseases through bodily fluids, such as semen, which could be left by patrons on surfaces inside the booths. Rather, the rationale is based on the finding "[s]exual acts, including masturbation and oral and anal sex, occur at unregulated adult entertainment establishments, especially those which provide private or semi-private booths or cubicles for

---

**3.** A "glory hole" is a hole between two adjoining booths used to promote anonymous sex.

(LR, at 1310.)

viewing films or videos or live striptease and sex shows." (LR, at 142 [Ordinance No. 9479, § 21.1801(B)(3) ].) Furthermore, the open-booth requirement was intended to "reduce criminal activity, including illegal public sexual activity and prostitution/pandering" as well as "the spread of sexually transmitted diseases and other communicable diseases" which result from illegal sexual contact. (DeWitt Decl., Ex. B, at 3; LR, at 142–43.) Fantasyland's first argument is therefore based on an erroneous premise.

■ In addition, Fantasyland claims the County has not cited any direct or specific evidence in the Legislative Record to substantiate its assumption criminal activity is actually taking place at Fantasyland or as a result of Fantasyland's business. However, the County is not required to do so. It may rely on findings in relevant case law, as well as the experiences of other local governments, and is not required "to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence [it] relies upon is reasonably believed to be relevant to the problem [it] addresses." See Renton, 475 U.S. at 51–52, 106 S.Ct. 925. In other words, the County was and is entitled to rely on the studies and reports of others which are included in the record before the Court, as well as on judicial opinions, such as Spokane Arcade and Ellwest Stereo. Spokane Arcade and Ellwest Stereo reference and rely upon evidence collected by other local governments on the secondary effects associated with closed peep show or arcade booths. See, e.g., Spokane Arcade, 75 F.3d at 664–65 (drug usage and sexual conduct between patrons in the video booths, concluding open booths "would reduce the potential for crime"); Ellwest Stereo, 681 F.2d at 1245 n. 1 ("[sex-related criminal activity] occurs with great frequency in arcades where movies are exhibited in enclosed booths"). The type of evidence considered by the County in enacting the open-booth requirement has been held "reasonable and relevant" in other cases. See, e.g., Dream Palace, 384 F.3d at 1015. In sum, Fantasyland's evidence is insufficient as a matter of law to cast direct doubt on the evidence supporting the County's rationale for the open-booth requirement.

### C. Narrowly Tailored

Last, Fantasyland argues the open-booth requirement is not narrowly tailored because there are more effective and less drastic means to accomplish the County's purported objectives. Fantasyland relies on Mr. Andrus' declaration, which outlines a number of ways to "combat sexual contacts between customers in the viewing areas." (Andrus Decl., at 5.) For example, Mr. Andrus suggests it would be effective to reduce the size of viewing areas so that only one person could fit in a booth and to modify the doors so that they do not reach the floor. He also opined open booths have "considerable drawbacks from the standpoint of avoiding sexual contact between customers" because open booths

> encourage[ ] interaction amongst customers who are viewing motion pictures. When viewing areas are enclosed, customers are insulated from each other. When the viewing areas are open, the combination of sexually explicit motion pictures and an open atmosphere can create a phenomenon, sometimes known as "cruising," where homosexual males meet, culminating in relatively anonymous sexual encounters after they leave the business. That results in sexual activity in the neighborhood surrounding the business over which the business has no control.

(Andrus Decl., at 6.)

■ Fantasyland's argument—the County's chosen means is not the best—is

to no avail, however. Under intermediate scrutiny, the government is not required to establish the means it has chosen is the least restrictive or the most effective for addressing a particular problem. A time, place, and manner restriction is considered narrowly tailored if the government shows its chosen means "serve[s] a substantial government interest," and affects only that category of businesses shown to produce the unwanted secondary effects. *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925. Nor is the County required to show the open-booth requirement will be effective in combating the negative secondary effects. Local governments "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 52, 106 S.Ct. 925.

The uncontradicted evidence in this case shows the open-booth requirement is aimed at reducing unlawful sexual activities and in preventing the resulting spread of sexually transmitted diseases. Fantasyland does not dispute these are substantial government interests. Furthermore, the County's regulation directly targets only that part of adult entertainment business which is known to "produce the unwanted secondary effects." *See Renton,* 475 U.S. at 52, 106 S.Ct. 925. Fantasyland does not dispute this. Although Mr. Andrus' declaration suggests the County could have chosen to address its substantial interests through other means, this is not material under the controlling law.

## V. *Performance Restrictions*

### A. *Nudity Ban*

In its complaint, Deja Vu alleges it had planned to offer nude dancing, and had obtained the appropriate permit from the County, when it acquired its present premises. Subsequently, the County amended the adult entertainment ordinance to prohibit live nude entertainment. (LR, at 155 [Ordinance No. 9479, § 21.1812(a) ("It

shall be a violation of this chapter for a patron, employee or any other person in an adult entertainment establishment, to knowingly or intentionally appear in a state of nudity regardless of whether such public nudity is expressive in nature.") ].) The amended ordinance does not prohibit live semi-nude entertainment under conditions specified therein. (*Id.* [§ 21.1812(b) ].) Deja Vu claims prior to the amendment, female performers did not have to wear anything more than "pasties and a G-string." (Pls.' Joint Mot., at 12.) After the amendment, they must wear more opaque clothing while performing, which Deja Vu refers to as "pasties and a G-string plus." (*Id.*)

### 1. *The First Amendment Claim*

 Deja Vu alleges the ordinance as amended violates the First Amendment because it is unjustified based on the factual record and relevant Supreme Court case law. The County moves for summary judgment on Deja Vu's First Amendment claim regarding the nudity ban, and Deja Vu cross-moves on the same claim. Specifically, Deja Vu contends the County lacked sufficient evidence in support of this amendment, and the amendment is not narrowly tailored.

### a. *Evidentiary Support for the Amendment*

Deja Vu argues the evidence the County relied on in amending the ordinance is insufficient because no evidence in the record addresses "secondary effects attributable to non-nude dancing" (*i.e.,* the secondary effects associated with pasties and a G-string plus, rather than just pasties and a G-string). (Pls.' Opp'n, at 14.) The County relied on the Legislative Record described above, which includes numerous studies from other jurisdictions, experiences of other municipalities as reported in

case law, and local public testimony regarding secondary effects such as prostitution, public sexual activity, and narcotics trafficking. (*See, e.g.,* LR, at 499–500, 1278, 1310, 1312, 1488–531, 1634–40.) Furthermore, the ordinance itself cites relevant Supreme Court and Ninth Circuit cases which discuss the secondary effects associated with nude dancing. (*See* LR, at 141 [Ordinance No. 9479, § 21.1801].)

Deja Vu does not offer any evidence of its own to cast direct doubt on the County's evidence, but relies exclusively on Dr. Linz' observation "[n]o study specifically deals with adverse secondary effects related to the presence of pasties and G-string establishments." (Linz Decl., at 5.) Essentially, Deja Vu argues the absence of this evidence in the record is sufficient to show the County's evidence is shoddy. Deja Vu's argument was rejected in *Gammoh v. City of La Habra*, where the plaintiffs argued the government's evidence was irrelevant to the ordinance imposing a minimal distance between patrons and erotic dancers because "it does not measure the secondary effects of *clothed* performances." 395 F.3d 1114, 1127 (9th Cir. 2005). "No precedent requires the [government] to obtain research targeting the exact activity that it wishes to regulate: the [government] is only required to rely on evidence 'reasonably believed to be relevant' to the problem being addressed." *Id.* (quoting *Alameda Books,* 535 U.S. at 438, 122 S.Ct. 1728.) The type of evidence considered by the County has been held "reasonable and relevant" in other cases. *See Dream Palace,* 384 F.3d at 1015. Dr. Linz' observation is therefore insufficient as a matter of law to cast doubt on the County's evidence or raise a genuine issue of material fact in opposition to the County's motion.

### b. Narrowly Tailored

Deja Vu next argues the amendment goes too far because under the Supreme Court precedent, pasties and a G-string is the maximum amount of clothing a government can require exotic dancers to wear "without running afoul of the federal right to freedom of expression." (Pls.' Joint Mot., at 13.) However, the Court does not interpret the pertinent case law as Deja Vu does.

 Nude dancing is "expressive conduct within the outer perimeters of the First Amendment." *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); *see also Pap's,* 529 U.S. at 289, 120 S.Ct. 1382. "[G]overnment restrictions on public nudity ... should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." *Pap's,* 529 U.S. at 289, 120 S.Ct. 1382 (plurality opinion). The *Renton* factors applicable to time, place, and manner restrictions and the *O'Brien* framework are "similar or identical." *Colacurcio v. City of Kent,* 163 F.3d 545, 551 (9th Cir. 1998) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). *United States v. O'Brien* held:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Deja Vu argues the ordinance at issue is unconstitutional because it does not satisfy the narrow tailoring requirement of the *O'Brien* framework.

Contrary to Deja Vu's argument, case law finding pasties and a G-string to satis-

fy narrow tailoring does not suggest any additional coverage requirement, no matter how slim, would be unconstitutional:

> [T]he requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic. ... [¶] ... [T]he governmental interest served by the text of the prohibition is societal disapproval of nudity in public places and among strangers. The statutory prohibition is not a means to some greater end, but an end in itself. It is without cavil that the public indecency statute is "narrowly tailored"; Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose.

*Barnes,* 501 U.S. at 571–72, 111 S.Ct. 2456. Similarly, the holding in *Pap's* does not support Deja Vu's argument:

> The ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis.* The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message.

*Pap's,* 529 U.S. at 301, 120 S.Ct. 1382.

The relevant Supreme Court cases do not stand for the proposition pasties and a G-string is the maximum amount of clothing a government can require exotic danc-

ers to wear without offending the First Amendment. Rather, these cases establish the government has a legitimate interest in placing restrictions on public nudity (*i.e.,* the conduct element of nude dancing), so long as those restrictions have only a *de minimis* or minimal effect on a dancer's erotic message. In sum, under *Barnes* and *Pap's,* the issue is whether the County's new requirement is still an incidental or "minimal restriction," which "leaves ample capacity to convey the dancer's erotic message." *See Pap's,* 529 U.S. at 301, 120 S.Ct. 1382 (plurality opinion).

Deja Vu contends the amended ordinance imposes more than a minimal restriction on speech because it requires entertainers to wear in addition to pasties also "a swimsuit bottom or shorts to opaquely cover her 'anal cleft or cleavage.'" (Pls.' Joint Opp'n, at 13.) Although this attire would not violate the amended ordinance, it is not required by it. Specifically, the amended ordinance prohibits nudity, which is defined as

> showing of the human male or female genitals, pubic area, vulva, penis, anal cleft or cleavage with less than a fully opaque covering or the showing of the female breast with less than a fully opaque covering of any part of the nipple.

(LR, at 147 [Ordinance No. 9479, § 21.1802(G) ].)

The Ninth Circuit has not addressed whether this regulation falls short of *O'Brien;* however, other circuits have considered similar regulations.[4] Deja Vu re-

---

4. Since it does not appear Deja Vu intends to offer alcohol in addition to nude entertainment, the Court excludes from consideration the circuit court decisions cited by the County which are based on the combination of nudity and alcohol. *See, e.g., Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702, 706 n. 5, 727–28 (7th Cir.2003) ("[p]rohibiting alcohol on the premises of adult entertainment establishments will unquestionably reduce the en-

hanced secondary effects resulting from the explosive combination of alcohol consumption and nude or semi-nude dancing"); *Geaneas v. Willets,* 911 F.2d 579, 582–83 (11th Cir.1990) (district court did not err in analyzing a nudity ban "in establishments dealing in alcohol" under the Twenty–First Amendment, which gives the states the broad authority to regulate alcohol sales, rather than the First Amendment, because of Supreme Court prec-

lies on *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee County,* 337 F.3d 1251 (11th Cir.2003), where the Court of Appeals reversed and remanded an order granting the government's summary judgment motion. The ordinance at issue prohibited nudity, which was defined more expansively than in *Pap's* "to encompass wearing any clothing covering less than one-third of the buttocks or one-fourth of the female breast," and expressly prohibited "the wearing of G-string, T-backs, dental floss, and thongs." *Id.* at 1273; *see also id.* at 1254 n. 2. Before remanding for consideration whether this definition proscribes too much expression, the court found "it difficult to conclude ... that preventing erotic dancers from wearing G-strings, thongs, pasties and the like has only a 'de minimis' effect on the expressive component of erotic dancing." *Id.* at 1274. Since *Peek–A–Boo* involved a much more restrictive definition of nudity than the definition at issue in this case, it is not helpful in answering the question whether the County's new definition is still an incidental or "minimal restriction," which "leaves ample capacity to convey the dancer's erotic message."

*Heideman v. South Salt Lake City,* 348 F.3d 1182 (10th Cir.2003), evaluated the constitutionality of a nudity ban similar to the one at issue here. *Id.* at 1186 n. 4, 1199–1200. The ordinance in *Heideman* prohibited "showing of the human male or female genitals, pubic area, vulva, anus, or anal cleft with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple." *Id.* at 1186 n. 4. *Heideman* found this nudity ban was indistinguishable from that upheld by the

Supreme Court in *Pap's.* 348 F.3d at 1185, 1200. Specifically, *Heideman* found the provision was narrowly tailored:

> [T]he district court did not abuse its discretion in concluding that the Ordinance satisfies the fourth and final *O'Brien* factor-that the restriction is no greater than is essential to the furtherance of the government interest-for the same reason that factor was satisfied in *Pap's:* the requirement that dancers wear "g-strings" and "pasties" has a "*de minimis*" effect on their ability to communicate their message.

*Id.* at 1200.

The Court finds the definition of nudity in *Heideman* is not distinguishable in a constitutionally-meaningful way from the County's new definition. Although *Heideman* referred to the "G-strings and pasties" rather than "G-strings and pasties plus," the actual language of the ordinance, which requires opaque covering of the anal cleft, parallels the County's language here, which requires opaque covering of the anal cleft or cleavage.

Based on the foregoing, and in the absence of any evidence how the County's new requirement would affect the dancers' erotic message, the Court finds Deja Vu has failed to raise a genuine issue of material fact in opposition to the County's summary judgment motion. *A fortiori,* it has failed to meet its burden as the moving party on its cross-motion.

### 2. The California Constitution Claim

In addition to the First Amendment challenge to the nudity ban, Deja Vu also contends it violates Article I, Section 2 of the California Constitution. While Deja

---

edent that the states' powers under the Twenty–First Amendment "outweigh any first amendment interest in nude dancing"); *Grand Faloon Tavern, Inc. v. Wicker,* 670 F.2d 943, 944, 946–51 (11th Cir.1982) (affirming

the connection between nude and semi-nude entertainment, alcohol consumption, and criminal activity "justified the incidental burdens on First Amendment rights created by the regulation of nude entertainment").

Vu seeks summary adjudication of this issue in its favor, which the County opposes, the County does not raise this issue in its own cross-motion for summary judgment.

Deja Vu contends totally nude dancing is protected under California Constitution, except in establishments serving alcohol. However, Deja Vu's authority, *Morris v. Municipal Court,* 32 Cal.3d 553, 186 Cal. Rptr. 494, 652 P.2d 51 (1982), is distinguishable and no longer supports this proposition.

*Morris* held a county ordinance was unconstitutionally overboard, and issued a writ of prohibition in favor of a nude dancer who was "arrested for having exposed her buttocks during a performance" in violation of the ordinance. *Id.* at 556, 569, 186 Cal.Rptr. 494, 652 P.2d 51. The ordinance was ultimately found unconstitutional because the only government interest it was intended to serve was the "promotion of public morals," which the court found constitutionally insufficient. *Id.* at 566–69, 186 Cal.Rptr. 494, 652 P.2d 51. As discussed above, unlike in *Morris,* the County's aim here is otherwise.

More importantly, *Morris* is no longer good law. The majority's analysis relied extensively on United States Supreme Court authority for the holding. *Id., passim.* Since *Morris* predates *Barnes* and *Pap's,* it is no longer valid to the extent it prohibited restrictions on nudity which were later approved in *Barnes. See Tily B., Inc. v. City of Newport Beach,* 69 Cal. App.4th 1, 18, 81 Cal.Rptr.2d 6 (1998) ("*Morris* was a state court interpretation of federal constitutional law since foreclosed by *Barnes.*"). Furthermore, the decision in *Morris* is in part based on the proposition the *O'Brien* test does not apply to the regulation of nudity. *Morris,* 32 Cal.3d at 559, 186 Cal.Rptr. 494, 652 P.2d 51. This proposition was negated in *Pap's. See* 529 U.S. at 289, 120 S.Ct. 1382.

Deja Vu also argues the nudity ban is unconstitutional under California law because the free speech provisions of the California Constitution are "more definitive and inclusive than the First Amendment." *See Spiritual Psychic Sci. Church v. City of Azusa,* 39 Cal.3d 501, 519, 217 Cal.Rptr. 225, 703 P.2d 1119 (1985), *overruled in part by Kasky v. Nike, Inc.,* 27 Cal.4th 939, 968, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002) (quoting *Wilson v. Sup.Ct.,* 13 Cal.3d 652, 658, 119 Cal.Rptr. 468, 532 P.2d 116 (1975)). Deja Vu likens this case to *Pap's* on remand to Pennsylvania Supreme Court, which concluded a similar anti-nudity ordinance violated the Pennsylvania Constitution, although the United States Supreme Court concluded it did not violate the First Amendment. *Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591, 593 (2002). It is beyond question

> the California Constitution is an independent document and its constitutional protections are separate from and not dependent upon the federal Constitution, even when the language of the two charters is the same. (Cal. Const., art. I, § 24.) In this instance, the language of the relevant California constitutional provision differs from, and in some respects is broader than, the federal Constitution.

*Los Angeles Alliance for Survival,* 22 Cal.4th at 365, 93 Cal.Rptr.2d 1, 993 P.2d 334.

Nevertheless, current California law does not support Deja Vu's argument the California Constitution mandates a different result than the First Amendment in this instance. Without reference to *Morris,* subsequent California Supreme Court opinions have applied the time, place, and manner test "fashioned from a long line of United States Supreme Court cases." *Id.* at 367 n. 7, 93 Cal.Rptr.2d 1, 993 P.2d 334; *see also Raven v. Deukmejian,* 52 Cal.3d

336, 353, 276 Cal.Rptr. 326, 801 P.2d 1077 (1990) ("cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution."). Accordingly, the same intermediate scrutiny of reasonable time, place, and manner restrictions, applied above to Deja Vu's First Amendment argument, applies to its California Constitution argument.[5]

Based on the foregoing, Deja Vu has not established the County's new nudity ban violates the California Constitution. Accordingly, Deja Vu's summary judgment motion as to the nudity ban claim under California Constitution is denied for the same reasons its motion with respect to the nudity ban under the First Amendment was denied.

### B. Proximity Limit and Staging Requirement

■ Deja Vu's complaint challenges on First Amendment grounds the proximity limit and staging requirement of the amended ordinance, which requires semi-nude entertainers to perform "at least six (6) feet from the nearest area occupied by patrons and on a stage elevated at least eighteen (18) inches from the floor." (LR, at 155 [Ordinance No. 9479, § 21.1812(b) ].) The County moves for summary judgment on this claim, and Deja Vu cross-moves on the same claim. Deja Vu contends that when considered together with the nudity ban, the County lacks sufficient evidence in support of the new distance and staging requirements, and these requirements are not narrowly tai-

lored when considered together with the nudity ban.

The purpose of the proximity limit and staging requirement is to reduce the opportunity for prostitution and narcotics transactions between entertainers and patrons. To support these new requirements, the County relied on the Legislative Record, which, as discussed above, compares favorably to the evidence relied on in other cases to support similar regulations, and which has been found to be "reasonable and relevant" in other cases.

As with the nudity ban, for its argument the County had insufficient evidentiary support, Deja Vu offers no evidence of its own, but relies on Dr. Linz' observation, "[n]o study specifically deals with adverse secondary effects related to the presence of pasties and G-string establishments." (Linz Decl., at 5.) As discussed above, this is insufficient as a matter of law to cast doubt on the County's evidence or raise a genuine issue of material fact in opposition to the County's motion.

Deja Vu also argues the staging requirement and proximity limit are not narrowly tailored when viewed in combination with the nudity ban. Specifically, it contends "nude dance entertainment is totally precluded" or "totally forbidden" and "[d]ancers clothed under the County's [new restriction on nudity] no longer pose the risk of purported adverse secondary effects relied on to justify the elevated stage and proximity limit." (Pls.' Joint Opp'n, at 16–17.) This is an overstatement. As discussed above, in conjunction with the proximity and staging restrictions, the amended ordinance permits semi-nude dancing which requires *de minimis* coverage.

---

**5.** Although California courts rely primarily on California—rather than federal—law to analyze the issue whether a regulation is content-based, *Los Angeles Alliance for Survival,* 22 Cal.4th at 365, 367–78, 93 Cal.Rptr.2d 1, 993 P.2d 334, Deja Vu does not contend the nudity ban is content-based, and does not challenge the applicability of the intermediate scrutiny standard.

In addition, Deja Vu's unsupported premise—that semi-nude entertainers who perform in close proximity to patrons no longer pose any risk of engaging in prostitution, pandering, or drug trafficking—has been rejected by the Ninth Circuit. *Gammoh v. City of La Habra* considered the constitutionality of an ordinance prohibiting contact between patrons and dancers, and requiring dancers to perform at least two feet away from patrons. 395 F.3d at 1118–19. The court found the "two-foot rule and the no-touching rule are reasonably linked to the secondary effects that the [government] identifies as its purpose in enacting the Ordinance"—combating "secondary effects, such as solicitation of prostitution and drug transactions." *Id.* at 1125–26. The opinion rejects the argument there is no legitimate justification for the distance requirement in conjunction with the minimal clothing requirement:

> The presence or absence of minimal clothing is not relevant to whether separation requirements fulfill the stated purpose of the Ordinance. This circuit recognizes that municipalities may reasonably find that separation requirements serve the interest of reducing the secondary effects of adult establishments. "Buffers" between patrons and performers prevent the exchange of money for prostitution or drug transactions and allow enforcement of "no touching" provisions, which would otherwise be virtually unenforceable.... There is no reason to believe that minimal clothing obviates the need for these measures when the atmosphere is equally charged-money exchanges and touching are no more difficult if the dancer is wearing minimal clothing than if she is partially or fully nude.

*Id.* at 1127. The proximity and no-touching restrictions were found to be constitutional time, place, and manner restrictions even when considered in combination with the clothing requirement. *Id.* at 1128.

Similar staging and distance requirements in combination with other regulations were upheld as constitutional. *Colacurcio v. City of Kent* held constitutional an ordinance requiring dancers perform on a platform at least twenty-four inches high and ten feet from the patrons in combination with minimum-lighting and no-tipping provisions. 163 F.3d at 548–49. The plaintiffs had previously offered table dancing, which was prohibited by the new staging and distance requirements, and offered "declarations of a cultural anthropologist and a communications expert attesting to the uniqueness of table dancing and the detrimental effect of the ten-foot rule on the dancer's message." *Id.* at 555. Regardless, the Ninth Circuit concluded "table dancing in private nightclubs, with documented links to prostitution and drug dealing, is a highly unlikely candidate for special protection under the First Amendment." *Id.* at 556. Accordingly, the distance requirement was upheld as a matter of law. *Id.* at 556–57 (the staging requirement was not challenged).

*Kev, Inc. v. Kitsap County* upheld an ordinance which required "dancing occur on a raised platform at least ten feet from patrons" in combination with a prohibition of certain touching between patrons and dancers, and the prohibition of direct payment or receipt of gratuities, among other things. 793 F.2d 1053, 1056 (9th Cir.1986). The court reasoned:

> Separating dancers from patrons would reduce the opportunity for prostitution and narcotics transactions. Similarly, prohibiting dancers and patrons from engaging in sexual fondling and caressing in an erotic dance studio would probably deter prostitution. Preventing the exchange of money between dancers and patrons would also appear to reduce the likelihood of drug and sex transactions occurring on regulated premises.

*Id.* at 1061. It further concluded the staging and distance requirements did not unduly burden protected speech:

> [T]hese regulations do not significantly burden first amendment rights. While the dancer's erotic message may be slightly less effective from ten feet, the ability to engage in the protected expression is not significantly impaired. Erotic dancers still have reasonable access to their market.

*Id.* Based on the foregoing case law, and in the absence of any evidence, Deja Vu's opposition to the County's summary judgment motion with respect to the staging requirement and proximity limit fails as a matter of law, as does Deja Vu's cross-motion on the same claim.

### C. No Direct Tipping

Deja Vu's complaint challenges on First Amendment grounds the provision prohibiting direct tipping. The amended ordinance provides:

> It shall be a violation of this chapter for an employee, who regularly appears in a state of semi-nudity in the adult entertainment establishment, to knowingly or intentionally receive any pay or gratuity directly from any patron, or for any patron to knowingly or intentionally pay or give any gratuity directly to any employee who appears in a state of semi-nudity in the adult entertainment establishment.

(LR, at 155 [Ordinance No. 9479, § 21.1812(c) ].) The County moves for summary judgment on Deja Vu's First Amendment claim, and Deja Vu cross-moves on the same claim. In addition, Deja Vu moves for summary judgment on the theory the no-direct-tipping provision violates the Due Process Clause of the Fourteenth Amendment.

### 1. The First Amendment Claim

■ The no-direct-tipping provision is intended to work in conjunction with the staging requirement and proximity limit to reduce the opportunity for dancers and patrons to engage in prostitution, pandering, and narcotics transactions. The evidentiary record supporting this provision is the same as that referred to above in support of other performance regulations. For the reasons outlined above, this record is sufficient for the County to meet its initial burden of producing relevant evidence which fairly supports the no-direct-tipping provision. As to the direct-tipping prohibition, Deja Vu does not contend to the contrary.

Deja Vu recognizes the Ninth Circuit previously rejected a First Amendment challenge to a prohibition on direct tipping. *See Kev,* 793 F.2d 1053. It attempts to distinguish the County's amendment by arguing the provision is "overly broad" and chilling of protected expression.

A First Amendment challenge to a no-direct-tipping regulation was rejected in *Kev.* 793 F.2d at 1061–62. Similarly to the County's amendment in this case, the ordinance in *Kev* provided: "No patron shall directly pay or give any gratuity to any dancer [and] no dancer shall solicit any pay or gratuity from any patron." *Id.* at 1061. In finding the provision a constitutional time, place, and manner restriction, the court reasoned "[p]reventing the exchange of money between dancers and patrons would ... appear to reduce the likelihood of drug and sex transactions occurring on regulated premises." *Id.*

Deja Vu attempts to distinguish *Kev* by arguing its direct-tipping prohibition was more precise because it applied only to dancers, whereas the County's provision is overly broad[6] because it applies to every

---

**6.** Although Deja Vu states the direct tipping prohibition is "overbroad" (Pls.' Joint Mot., at 18; Pls.' Joint Opp'n, at 19), it does not argue

the First Amendment overbreadth doctrine. Overbreadth is an "exception to the prudential limits on standing." *Young v. City of Simi*

employee who "regularly appears in a state of semi-nudity," and is not limited to "during a performance" or to "while in a state of semi-nudity." (Pls.' Joint Mot., at 18.) As discussed above, under intermediate scrutiny, the County is not required to establish the means it has chosen is the least restrictive for addressing a particular problem. A time, place, and manner restriction is considered narrowly tailored if the government shows its chosen means "serve a substantial government interest," and affects only that category of businesses shown to produce the unwanted secondary effects. *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925. Moreover, if the County were to implement Deja Vu's suggestions, the amendment would no longer serve the purpose of reducing the opportunity for dancers and patrons to engage in prostitution, pandering, and narcotics transactions, as "drug and sex transactions between employees and patrons would merely be delayed until after the performance, but would still take place on the premises. The same is true if an employee could solicit and accept tips by merely putting on additional clothes immediately following the completion of a performance." (Def.'s Opp'n, at 18.)

Deja Vu next argues the direct-tipping prohibition violates the First Amendment because it imposes a financial disincentive which discourages participation in protected speech. It contends tips are "an important source of income for many service employees," and claims California legislature has determined tipping "warrants special statutory protection." (Pls.' Joint Mot., at 19 [citing Cal. Lab Code § 351].[7]) In essence, Deja Vu is arguing the direct-tipping prohibition violates the First Amendment because of its potential adverse economic impact. Fantasyland made the same economic argument to challenge the open-booth requirement. Deja Vu's economic argument lacks merit for the same reasons Fantasyland's does. As discussed above, as long as there is no "absolute bar to the market . . ., it is irrelevant whether '[a regulation] will result in lost profits, higher overhead costs, or even prove to be commercially unfeasible for an adult business.'" *Spokane Arcade,* 75 F.3d at 666 (alteration in the original) (quoting *Walnut Properties,* 861 F.2d at 1109); *see also Matney,* 86 F.3d at 698

---

*Valley,* 216 F.3d 807, 815 (9th Cir.2000). Specifically, "[u]nder the overbreadth doctrine, a plaintiff may challenge government action by showing that it may inhibit the First Amendment rights of parties not before the court[, and] is based on the idea that the very existence of some broadly written laws has the potential to chill the expressive activity of *others not before the court."* *Dream Palace,* 384 F.3d at 999 (internal citations and quotations omitted). However, Deja Vu does not cite to any authority addressing the overbreadth doctrine. Furthermore, standing is not an issue because Deja Vu is an existing adult entertainment business directly affected by the amendment. *See id.* The Court therefore construes Deja Vu's references to overbreadth as an argument the direct-tipping prohibition is not narrowly tailored. To the extent Deja Vu intended to assert the First Amendment rights of its performers, the sub-

stantive First Amendment analysis of the direct-tipping prohibition is the same.

7. In opposition to Deja Vu's summary judgment motion, the County assumes Deja Vu's reference to California Labor Code Section 351 is an attempt by Deja Vu to raise a separate claim under California law for a violation of section 351, and argues the Court should deny any such claim. To the extent Deja Vu intended to allege this claim, it is not included in its operative complaint, and Deja Vu does not seek to amend it. The claim is therefore not included in this action. Furthermore, a review of Deja Vu's briefing on cross-motions for summary judgment indicates the references to section 351 are made to support the argument tipping deserves special protection under the First Amendment rather than in an attempt to raise a new claim.

("an incidental financial effect on adult entertainment speakers" is of no constitutional significance). Deja Vu presented no evidence from which the trier of fact could infer the County's direct-tipping prohibition represents a complete bar to the market. Furthermore, Deja Vu's argument overstates the implication of the provision. The County's amended ordinance does not prohibit all tipping, and does not preclude entertainers from receiving tips indirectly through the use of a "tip jar." (*See* Def.'s Opp'n, at 18.)

Based on the foregoing, as a matter of law, none of Deja Vu's arguments in support of its First Amendment challenge to the direct-tipping prohibition is sufficient to successfully oppose the County's summary judgment motion, or to prevail on Deja Vu's cross-motion.

### 2. The Due Process Claim

Deja Vu also claims the direct-tipping prohibition violates due process because it is impermissible vague, and because it violates the liberty interest in working for a living in the common occupations of the community, and the provision "interferes with occupational liberty interests." (Pls.' Joint Mot., at 20.) Neither argument is sufficient to find the direct-tipping prohibition unconstitutional.

■ First, Deja Vu argues the phrase "regularly appears in a state of semi-nudity" is impermissibly vague because "regularly" is not defined, and it is unclear whether it means semiannually, daily, monthly, throughout a shift, or "only a couple of times per night." (Pls.' Joint Mot., at 18.) "A fundamental requirement of due process is that a statute must clearly delineate the conduct it proscribes." *Kev,* 793 F.2d at 1057 (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). "[T]he void-for-vagueness doctrine requires a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). For example, a statute which required people on the street "to provide a 'credible and reliable' identification" to a police officer when requested to do so was held unconstitutionally vague because it contained "no standard for determining what a suspect has to do to satisfy the requirement," and thus vested "virtually complete discretion in the hands of the police to determine whether the suspect [had] satisfied the statute." *Id.* at 353–54, 358, 103 S.Ct. 1855.

■ However, a statute or ordinance is not unconstitutionally vague simply because it includes a flexible standard or provides some discretion for enforcement officials. For example, an ordinance prohibiting "the making of any noise or diversion which disturbs or tends to disturb the peace or good order" is not unconstitutionally vague. *Grayned,* 408 U.S. at 107–08, 92 S.Ct. 2294. This language is marked by "flexibility and reasonable breadth, rather than meticulous specificity." *Id.* at 110, 92 S.Ct. 2294. Nevertheless, the ordinance was found sufficiently specific because it "clearly delineate[d] its reach in words of common understanding." *Id.* at 112, 92 S.Ct. 2294 (internal quotations omitted); *see also Kev,* 793 F.2d at 1057–58 (" 'Caressing' and 'fondling' are ordinary, commonly used terms," easily understood when read in the context of other ordinance provisions). "[W]here first amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Kev,* 793 F.2d at 1057.

Likewise, "regularly" is a word of common understanding and of sufficient definiteness that ordinary people can un-

derstand. The dictionary definition of "regular" is "recurring, attending, or functioning at fixed or uniform intervals." Merriam–Webster's Collegiate Dictionary, 986 (10th Ed.1998). Deja Vu argues the term is vague because there is nothing to indicate precisely how many times an employee must appear in a state of semi-nudity to have "regularly" done so. For example, could penalties be imposed against an employee hired as a waitress who collects tips during her shift and then occasionally appears as a dancer in a state of a semi-nudity? The answer is yes, based on the dictionary definition and common sense meaning of the word. "[E]ven a low frequency of occurrence can establish regularity," and the term "regularly" is not vague simply because it does not specify the frequency. *City of Cleveland v. Daher*, No. 98–CVH–12396, 2000 WL 1844739, **4–6, 2000 Ohio App. LEXIS 5937, at *15–17 (Ohio Ct.App.2000). "[S]ome imprecision is unavoidable." *Id.; see also Grayned*, 408 U.S. at 110, 92 S.Ct. 2294 ("we can never expect mathematical certainty from our language").

Although a constitutional vagueness challenge to the use of the word "regular" or "regularly" in the context of an adult entertainment ordinance has not been considered by the Ninth Circuit, similar challenges have been rejected by other courts based on the reasons discussed above. *See 511 Detroit St., Inc. v. Kelley*, 807 F.2d 1293, 1295–97 (6th Cir.1986) (anti-obscenity law imposing criminal penalties for dissemination of obscene materials as a "predominant and regular part" of a business found not unconstitutionally vague, reasoning a statute is not unconstitutional just because "there are cases near the margin where it is difficult to draw the line"); *Britt v. State of Florida*, 775 So.2d 415, 416–17 (Fla.Ct.App.2001) (parole condition forbidding those convicted of sexual crimes against children from working, volunteer-

ing, or living near any "school, daycare center, park, playground, or other place where children regularly congregate" was "sufficiently precise," and not unconstitutionally vague); *Haviland Hotels, Inc. v. Oregon Liquor Control Comm'n*, 20 Or. App. 115, 530 P.2d 1261, 1262–63 (1975) (local regulation requiring certain businesses to provide "regular meals during the usual hours when such meals are regularly served" not void for vagueness because "regular meals" has "a clear, grassroots connotation"); *Daher*, 2000 WL 1844739, *4, **4–6, 2000 Ohio App. LEXIS 5937, at *13, 15–17 (zoning law restricting location of adult cabarets which "regularly" feature topless dancers held not unconstitutionally vague because the term "regularly" was not so imprecise that it could not be understood by ordinary persons without a statement by the government setting forth "a distinct frequency below which topless entertainment is not subject to the zoning ordinance"). Accordingly, the Court finds the term "regularly" as used in the no-direct-tipping provision of the amended ordinance is not impermissibly vague.

█ In its second due process argument, that the direct-tipping prohibition interferes with occupational liberty interests, Deja Vu restates its First Amendment claim as a substantive due process claim. However, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

Based on the foregoing, Deja Vu's summary judgment motion is denied with respect to the due process challenges to the direct-tipping prohibition. Furthermore, since this challenge fails as a matter of law, the due process claim is dismissed.

### D. No Touching

■ Deja Vu's complaint challenges on the First Amendment grounds the no-touching provision of the County's amended ordinance, which provides in pertinent part:

> It shall be a violation of this chapter for an employee who regularly appears in a state of semi-nudity in an adult entertainment establishment, to knowingly or intentionally touch a customer or the clothing of a customer while on the premises of the establishment.

(LR, at 155 [Ordinance No. 9479, § 21.1812(d) ].) The County moves for summary judgment on this claim, and Deja Vu cross-moves on the same claim.

The no-touching provision is intended to work in conjunction with the other performance restrictions discussed above to reduce the opportunity for dancers and patrons to engage in prostitution, pandering, and narcotics transactions. The legislative record supporting the no-touching provision is the same as that discussed above, and is sufficient to meet the County's initial burden of producing relevant evidence which fairly supports the no-touching provision.

A First Amendment challenge to a no-touching provision has been rejected by the Ninth Circuit. *Kev,* 793 F.2d at 1061–62. As with the direct-tipping prohibition, Deja Vu attempts to distinguish the County's amendment by arguing it is not narrowly tailored[8] because it is not limited to "sexual touching," it is redundant when considered together with the staging requirement and proximity limitation, interferes with an individual's right to associate, and because it is directed only to the employees and not the patrons. (Pls.' Joint Mot., at 21; Pls' Joint Reply, at 12.)

The County's amendment differs from the ordinance in *Kev* because is not limited to sexual touching, and it focuses on employee—rather than patron—conduct. Deja Vu argues a patron could grope or grab an "employee who regularly appears in a state of semi-nudity" but the employee would not be free to push the patron away. These distinctions, however, are without a difference. As discussed above, a time, place, and manner restriction is considered narrowly tailored if the government shows its chosen means "serve a substantial government interest," and affects only that category of businesses shown to produce the unwanted secondary effects. *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925. Intermediate scrutiny does not require the government to establish the means it has chosen to address the secondary effects is the least restrictive. *Id.* Furthermore, the chosen means may discriminate or be under-inclusive without offending the First Amendment, because the government does not have to attempt to address all of its interests at one time. In *Renton,* for example, the location restriction only applied to adult theaters and not to other types of adult businesses. This is permissible because the government "must be allowed a reasonable opportunity to experiment with solutions" and may choose to single out and place limitations on "one particular kind of adult business." *Id.* at 52–53, 106 S.Ct. 925. In addition, the government has broad discretion in selecting a method "to further its substantial interests." *Id.*

---

8. Although Deja Vu again refers to terms such as "overly broad," it does not argue the over-breadth doctrine.

at 52, 106 S.Ct. 925. It is therefore of no constitutional significance that the County directed the no-touching provision to the employees' conduct, not the patrons.'

Deja Vu further argues the no-touching provision is not narrowly tailored because the proximity limit and the staging requirement already make touching between patrons and performers "impossible." (Pls.' Joint Mot., at 21.) Deja Vu is mistaken in light of the express language of the performance restrictions. The proximity limit and staging requirement do not make touching impossible because they only apply while the employee is "in a state of semi-nudity." (LR, at 155 [Ordinance No. 9479, § 21.1812(b) ].) In contrast, the no-touching provision applies at all times "while on the premises of the establishment" to employees who regularly appear in a state of semi-nudity. The provisions are therefore not redundant but complementary. Furthermore, they target conduct likely to lead to the unwanted secondary effects of prostitution, pandering and drug trafficking.

Last, Deja Vu contends the touching ban is not narrowly tailored because it "runs from shaking the hand of a regular customer to hugging a relative or close friend, even when the entertainer is fully clothed." (Pls.' Joint Mot., at 21.) Deja Vu's argument is an overstatement; employees who regularly appear in the state of semi-nudity on the business premises are free to associate with whomever they choose when not on the premises.

Based on the foregoing, Deja Vu's arguments are insufficient as a matter or law to successfully oppose the County's summary judgment motion. *A fortiori,* they are insufficient to entitle Deja Vu to summary judgment on its cross-motion.

### VI. Zoning Restrictions

In its complaint Deja Vu challenges the amended zoning ordinance.[9] Prior to amendment, the ordinance permitted adult entertainment businesses to be located in commercial zones, provided they were at least 500 feet from residential zones, 600 feet from any church, school, public playground, park or recreational area, and 1,000 feet from any other adult entertainment business. While the amendment retains the distance and separation requirements, it requires adult entertainment businesses to locate in industrial, rather than commercial, zones. (*See* LR, at 25 [Ordinance No. 9469, § 6930(b)(2) ].) Businesses such as Deja Vu, which had obtained a permit to operate in a commercial zone prior to the amendment, must relocate to an industrial zone within three years.

The zoning ordinance was amended to reduce the negative secondary effects, specifically the blight, noise, traffic, and crimes such as robbery, property theft, assault and battery, which affect neighboring businesses and their patrons in commercially zoned areas. In addition, the amendment was intended to ameliorate decreased property values in commercially zoned areas.

Deja Vu alleges the zoning amendment violates "the adult public's right to freedom of speech, press and expression protected by the First and Fourteenth Amendments to the United States Constitution, and Article 1, § 2 of the California Constitution." (First Am. Compl., at 20; *see also id.* at 14 & 23.) The County moves for summary adjudication on Deja Vu's claim, and Deja Vu cross-moves on the same claim. The County contends the amended zoning ordinance meets the First Amendment intermediate scrutiny. Deja

---

**9.** As discussed below, as a practical matter, this provision affects only Deja Vu.

Vu does not dispute intermediate scrutiny applies to the zoning amendment, however, it contends the amendment fails to meet its requirements. In addition, Deja Vu argues the procedural safeguards of the zoning amendment are not constitutionally sufficient, the amendment is void because it violates the County's General Plan, and constitutes unlawful spot zoning.

## A. The General Plan

Deja Vu contends the zoning ordinance amendment is invalid because it is inconsistent with the County's General Plan.[10] *See* Cal. Gov't Code § 65860. It seeks a finding that the amendment is unlawful on this basis, or in the alternative, contends the County's motion for summary adjudication of the constitutionality of the amendment be denied on this basis.

The General Plan claim is not raised in Deja Vu's operative complaint, and Deja Vu does not explain how its General Plan argument relates to the freedom of speech claims raised in the complaint. As the General Plan claim is not alleged in the complaint, and Deja Vu does not seek to amend it, its motion for summary judgment is denied to the extent it is based on this claim.

 In the alternative, Deja Vu's motion as to the General Plan claim is denied because it has failed to show the zoning amendment is inconsistent with the General Plan. "Once [a municipality] has adopted a general plan, all zoning ordinances must be consistent with that plan, and to be consistent must be 'compatible with the objectives, policies, general land uses, and programs specified in such a plan.'" *Lesher Communications, Inc. v. City of Walnut Creek,* 52 Cal.3d 531, 536, 277 Cal. Rptr. 1, 802 P.2d 317 (1990) (quoting Cal. Gov't Code § 65860(a)(ii)). [A] finding of consistency requires only that the proposed project be *compatible* with the objectives, policies, general land uses, and programs specified in the applicable plan. The courts have interpreted this provision as requiring that a project be in agreement or harmony with the terms of the applicable plan, not in rigid conformity with every detail thereof. *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco,* 102 Cal. App.4th 656, 678, 125 Cal.Rptr.2d 745 (2002) (internal quotation marks and citations omitted). "A zoning ordinance inconsistent with the general plan at the time of its enactment is invalid when passed." *deBottari v. City Council of the City of Norco,* 171 Cal.App.3d 1204, 1212, 217 Cal. Rptr. 790 (1985) (internal quotation marks and citations omitted).

Deja Vu relies on the declaration of R. Bruce McLaughlin, its land use planning and development expert. (McLaughlin Decl., at 18–25 & Ex. A.) Mr. McLaughlin opined the General Plan permits commercial uses in industrial zones so long as those commercial uses provide essential support services to manufacturing plants and their personnel. Deja Vu submits adult entertainment is not an essential support service to manufacturing plants and their personnel.

10. California Government Code Section 65860(a) states in part: "County or city zoning ordinances shall be consistent with the general plan of the county or city...." Section 65860(b) states in part: "Any resident or property owner within a city or a county, as the case may be, may bring an action or proceeding in the superior court to enforce compliance with subdivision (a). Any such action or proceeding shall be governed by Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. No action or proceeding shall be maintained pursuant to this section by any person unless the action or proceeding is commenced and service is made on the legislative body within 90 days of the enactment of any new zoning ordinance or the amendment of any existing zoning ordinance."

On the other hand, the County offers the opinion of David Hulse, the Land Use Chief for the County, in support of its argument that the amendment is consistent with the General Plan. (Hulse Supplemental Decl., at 1.) Mr. Hulse was "primarily responsible for drafting the amendment to the County's zoning ordinance that requires adult entertainment establishments to be located in industrial zones." (*Id.* at 1–2.) The General Plan states: "The Industrial Designations provide locations for manufacturing, industrial, wholesaling, and warehousing uses based on the potential nuisance characteristics or impacts of use." According to Mr. Hulse, the County's Department of Planning and Land Use "determined that the zoning ordinance amendment is consistent with the County's General Plan . . . . Specifically, the Department concluded adult entertainment establishments exhibit greater 'nuisance characteristics or impacts' than do most typical commercial establishments. Because the nuisance characteristics or impacts associated with adult entertainment establishments are closer to those exhibited by most industrial uses, the County determined it was more appropriate to require adult businesses to be located in industrial zones, where they will be more compatible with neighboring uses." (*Id.* at 2.) Deja Vu does not oppose or in any way address the County's evidence or argument that the amendment is consistent with the General Plan.

Since Deja Vu would bear the burden of proof at trial as to its General Plan claim, it has a higher burden on summary judgment. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence . . . establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage,* 213 F.3d at 480 (internal quotation marks and citations omitted). In other words, it

"must make a 'showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party,'" and "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor." *Pecarovich v. Allstate Ins. Co.,* 272 F.Supp.2d 981, 985 (C.D.Cal.2003) (internal citations omitted) (citing *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) and quoting Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487–88 (1984)).

Based on the language of the General Plan and expert opinions offered by each side, the Court cannot conclude Deja Vu made a showing sufficient to hold no reasonable trier of fact could find other than in Deja Vu's favor. Accordingly, even if Deja Vu had amended its complaint to include the General Plan claim, its summary judgment motion would be denied for failure to rebut the County's evidence.

Furthermore, since the General Plan argument is not responsive to the constitutional issues raised in the County's summary adjudication motion, issues of fact pertaining to the General Plan argument are not material. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (a fact is material if it could affect the outcome of the suit under the governing substantive law). To the extent Deja Vu relies on the General Plan argument to oppose the County's summary judgment motion, it is legally insufficient.

**B. Reasonable Time, Place, and Manner Regulation**

 Deja Vu contends the zoning amendment does not meet the intermediate scrutiny standard because is not supported by evidence showing it would advance a substantial government interest, is not narrowly tailored, and does not leave

open reasonable alternative means of communication.

### 1. Rationale for the Amendment

Deja Vu argues the amendment is unconstitutional because it is aimed at reducing secondary effects by reducing speech. "[T]he necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech. For this reason, it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects." *Alameda Books,* 535 U.S. at 450, 122 S.Ct. 1728 (Kennedy, J., concurring).

Deja Vu first argues the distance and dispersal provisions of the zoning ordinance before amendment achieved the same purpose of reducing secondary effects as after amendment, but without burdening the speech as much. This argument is unsupported by any evidence, and is therefore insufficient to raise a genuine issue of material fact. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

In the alternative, based on the County's responses to interrogatories, Deja Vu argues the zoning ordinance was amended to relocate adult entertainment businesses to industrial zones because this would reduce the number of adult entertainment patrons. If this were the County's reasoning for the amendment, it may well be impermissible; however, when the County's response to interrogatories is considered in context, Deja Vu's argument is not based on a fair reading of the County's rationale. The pertinent portion of the County's response was:

> The County believes that requiring adult entertainment establishments to be located in the industrial zones will reduce the negative secondary effects associated with adult entertainment establishments. Particularly, the County believes that blight, noise, traffic, and certain crimes including robbery, property theft, assault and battery will be reduced. The industrial zones are generally located further from residential areas than are the industrial *[sic]* zones. Thus, requiring adult entertainment establishments to be located in industrial areas will reduce noise, traffic, and crime that effect *[sic]* residential property owners. In addition, decreased residential property values will be ameliorated by requiring adult entertainment establishments to be located in industrial zones. Further, most commercial establishments rely on customers to visit their premises. Many industrial facilities ship their products to middlemen and therefore fewer customers tend to visit their premises. Thus, requiring adult entertainment establishments to be located in industrial areas will reduce noise, traffic, and crime that effect *[sic]* commercial property owners and their patrons. In addition, decreased commercial property values will be ameliorated by requiring adult entertainment establishments to be located in industrial zones. Finally, fewer citizens tend to frequent industrial zones as compared to commercial zones, particularly at night. Thus, the zoning change should reduce crimes such as assault, battery, robbery, and property theft by reducing the number of potential victims.

(Manicom Opp'n Decl., Ex. 1, at 5–6.) Deja Vu's argument is based entirely on the last two sentences of the response, ignoring the preceding text.

The response, when considered in its entirety, does not support the conclusion the County amended the ordinance to reduce the number of customers by making it more inconvenient to patronize adult

entertainment businesses. Instead, the focus was on the patrons of the neighboring businesses. Furthermore, many industrial businesses are closed at night when adult entertainment businesses are busiest. The neighboring industrial businesses and their patrons would therefore not be as affected by secondary effects such as noise, traffic and crime, as are commercial businesses, which are often open at night. The reference in the response to reducing the number of potential crime victims therefore referred to the patrons of the neighboring businesses, rather than to adult entertainment patrons. Based on the foregoing, Deja Vu's argument regarding the rationale for the amendment is not supported by evidence from which a rational trier of fact could infer the County's aim was to reduce the number of adult entertainment patrons rather than to reduce the secondary effects.

### 2. Evidentiary Support for Amendment

Deja Vu next argues the zoning amendment was enacted without evidentiary support. As outlined more fully above, Deja Vu relies on the declaration of Dr. Linz, who concluded the studies relied on by the County in enacting the amendments are unreliable. However, for the reasons discussed above, Dr. Linz' declaration is insufficient as a matter of law to cast direct doubt on the County's evidence, because it addresses only the studies and not other categories of evidence on which the County relied, and because it targets only some of the numerous secondary effects the amendment was intended to ameliorate. *See World Wide Video*, 368 F.3d at 1195–96. Dr. Linz' declaration is therefore insufficient to support Deja Vu's summary judgment motion, or to raise a genuine issue of material fact in opposition to the County's cross-motion.

### 3. Alternative Avenues of Communication

Zoning restrictions on adult entertainment businesses must allow "for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50, 52, 106 S.Ct. 925. "[T]he First Amendment requires only that [the government] refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the [municipality]." *Id.* at 54, 106 S.Ct. 925. The "reasonable alternative avenues of communication" inquiry consists of two steps. "[W]e first have to determine how many alternative sites are available, and then determine whether that number is sufficient to afford adult establishments a reasonable opportunity to locate." *Isbell v. City of San Diego*, 258 F.3d 1108, 1112 (9th Cir.2001) (internal citation omitted).

■ In its motion for summary judgment, the County contends the zoning amendment leaves 76 sites available for Deja Vu's relocation. In its cross-motion and in opposition to the County's motion, Deja Vu argues many of the sites identified by the County are not "available" as that term is defined for purposes of intermediate scrutiny, and the remaining sites are too few to constitute reasonable alternative avenues of communication.

### a. Availability of Alternative Sites

The burden of persuasion is on the County to demonstrate its amendment provides reasonable alternative avenues of communication. *See Isbell*, 258 F.3d at 1112. The County "cannot merely point to a random assortment of properties and simply assert that they are reasonably available to adult businesses." *See Lim*, 217 F.3d at 1055. If the County provides "a good faith and reasonable list of potentially available properties," the burden shifts to Deja Vu "to show that certain

sites would not reasonably become available." *See Isbell*, 258 F.3d at 1113 n. 5 (internal quotation marks and citation omitted). On the other hand, if Deja Vu can show the County's attempt "is not in fact in good faith or reasonable, by, for example, showing that a representative sample of properties are on their face unavailable, then the [County] will be required to put forth more detailed evidence." *See Lim*, 217 F.3d at 1055.

The County contends it has met its burden by identifying a total of 76 potentially available sites in the relevant real estate market, located in industrial zones and within the distance and separation requirements of the amended ordinance. (Hulse Decl., at 2.) These sites are located in eight different areas: Borrego Springs, Ramona, San Dieguito/Rancho Bemardo, Lakeside, Alpine, Pepper Drive–Bostonia, El Cajon, and Spring Valley. (*Id.* at 2; *see also* Nevin Decl.) In addition, the County used its Geographic Information System ("GIS"), which measures the distance between two points, and determined "that twelve adult entertainment establishments could operate simultaneously on the 76 sites identified by the County and still comply with the 1,000 feet separation requirement between adult entertainment establishments." (Hulse Decl., at 2.)

■ "For sites to be available, they must be in the 'actual business real estate market.'" *Isbell*, 258 F.3d at 1112–13 (quoting *Lim*, 217 F.3d at 1055). The following factors are relevant to the consideration whether a site is reasonably within the business real estate market: (1) a relocation site is not part of the market if it is unreasonable to believe that it would ever become available to any commercial enterprise; (2) a relocation site in a manufacturing or industrial zone that is reasonably accessible to the general public may also be part of the market; (3) a site in a manufacturing zone that has proper infrastructure may be included in the market; (4) a site must be reasonable for some generic commercial enterprise, although not every particular enterprise, before it can be considered part of the market; and (5) a site that is commercially zoned is part of the relevant market.... In addition, a site must obviously satisfy the conditions of the zoning ordinance in question.

*Id.* at 1113 n. 3 (quoting *Lim*, 217 F.3d at 1055).

Deja Vu contends "there are no sites available anywhere in unincorporated San Diego County for Adult Use," because all of the sites identified by the County are located in industrial zones which are not suitable for generic commercial land uses. (McLaughlin Decl., at 7.) Deja Vu claims this unsuitability is evidenced by "the absence of existing commercial uses" in these industrial zones, as well as the fact the only commercial uses permitted in industrial zones are adult entertainment establishments and essential or compatible support services to manufacturing plants and their personnel. (*Id.* at 9, 16.) Specifically, Deja Vu points out several sites do not have sidewalks and lighting.

■ The mere fact a site is located in an industrial zone does not make it unavailable. Relocation sites in industrial zones are considered available, if they are reasonably accessible to the public and have the appropriate infrastructure. *Topanga Press*, 989 F.2d at 1531. Whether the infrastructure provided is adequate depends on whether it is reasonably necessary for any generic commercial enterprise. *Diamond*, 215 F.3d at 1056. Roads, lighting and sidewalks are not required for every industrially-zoned site, "rather these are examples of what may constitute proper infrastructure." *Id.* Sites located along highways or main driv-

ing thoroughfares where it is unlikely people would walk along a sidewalk to reach the business, might not need sidewalks and street lighting, especially if the sites have other examples of infrastructure which may support a commercial enterprise, such as power, water, and access to a main road. *Id.*

The County's unrefuted evidence shows the sites lacking sidewalks and street lighting are located near major highways or major secondary roads. (Nevin Decl., at 3.) Based on *Diamond,* sidewalks and street lighting are unnecessary because the patrons would drive and not walk to the business. All the sites have access to power, are served by piped water or wells, or could be served by wells, and either have access to telephone service or could require the telephone company to install lines. (*Id.*) Deja Vu's argument that the sites are unavailable because they are located in industrial zones and lack streetlights and sidewalks fails as a matter of law.

In addition, Deja Vu argues many of the sites are unavailable because they are not suitable for an adult entertainment business due to low traffic, lack of visibility, current occupancy, unwillingness to lease to adult entertainment businesses, or unsuitability of existing premises for an adult entertainment use. (Luster Opp'n Decl.) This argument, which raises business and economic factors, is irrelevant under the governing law.

As long as it is a part of an actual business real estate market for generic commercial enterprises, whether a site is economically or physically suited for adult entertainment use is irrelevant. *Isbell,* 258 F.3d at 1113; *see also Topanga Press,* 989 F.2d. at 1531 ("[I]t is constitutionally

irrelevant whether relocation sites located in industrial or manufacturing zones suit the *particular* needs of an adult business."). "[T]he possible economic impact upon a business is not a factor to be considered by the courts when determining whether a [municipality] has provided a business with a reasonable alternate location." *Topanga Press,* 989 F.2d at 1529. If it is a part of an actual real estate market for generic commercial enterprises, "it is not relevant whether a relocation site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business." *Id.* at 1531. Furthermore, current occupancy and restrictive lease terms prohibiting adult uses are irrelevant. *Lim,* 217 F.3d at 1055 (restrictive leases banning adult entertainment and current occupancy); *Diamond,* 215 F.3d at 1056 (current occupancy); *Renton,* 475 U.S. at 53–54, 106 S.Ct. 925 (current occupancy).

The County concedes three of the 76 sites are occupied by single-use buildings such as warehouses and factories, which are over 65,000 square feet. (Nevin Decl., at 3.) This type of large single-use buildings "may arguably be outside [the] commercial real estate market." *See Lim,* 217 F.3d at 1055. Accordingly, the Court will not consider these sites in the analysis.[11]

Excluding the three large single-use sites, the Court finds the County met its burden to come forward with a good faith and reasonable list of potentially available sites. The County provided pertinent, specific and detailed information about each site. *See Lim,* 217 F.3d at 1055. Sites such as swamps, sewage treatment plants, airstrips for airports, sports stadiums, and land under the ocean are gener-

---

**11.** The County does not identify the three sites. Based on a detailed review of the exhibits attached to Mr. Nevin's declaration, the Court excludes sites no. 8 and 11 in Area 4 (parcels no. 326–050–12 and 326–060–18) and site no. 12 in Area 7 (parcel no. 483–071–11).

ally considered unavailable. *Topanga Press*, 989 F.2d at 1531, 1532. The County's list does not contain properties which on their face appear to be unavailable. *See Lim*, 217 F.3d at 1055–56. The burden therefore shifts to Deja Vu to show certain sites would not reasonably become available. *Id.*

*(i) Separation and Distance Requirements*

Deja Vu challenges specific sites based on the argument they do not meet the distance and separation requirements of the amended ordinance. To be available, the site must meet the requirements of the zoning ordinance in question. *Isbell*, 258 F.3d at 1113 n. 3 (quoting *Lim*, 217 F.3d at 1055). The burden is on Deja Vu to show certain sites would not reasonably become available. *See id.* at 1113 n. 5.

Based on the opinion of its expert, Bruce R. McLaughlin, Deja Vu argues three sites in Area 7 may not meet the segregation requirements, because it appears several parcels may have been merged into one. (McLaughlin Decl., at 12.) In his subsequent deposition, however, Mr. McLaughlin withdrew this opinion. Deja Vu's argument therefore remains without evidentiary support. In the absence of any evidence, Deja Vu failed to make a sufficient showing in support of its summary judgment motion, or raise a genuine issue of material fact in opposition to the County's motion, on the issue whether the sites in Area 7 are unavailable due to the separation requirements.

Deja Vu next argues the two sites in Area 5 are not available because they violate the distance requirement of the amended ordinance. The ordinance prohibits adult entertainment establishments from being located "within 600 feet of any ... public playground or park." (LR, at 25 [Ordinance No. 9469, § 6930(b)(2) ].) Deja Vu contends the Veterans of Foreign

Wars Facility, which includes the Tom C. Dyke Veterans Park, is located within 600 feet of two sites. (McLaughlin Decl., at 12.)

The term "park" is not defined in the amended ordinance, although other portions of the zoning code contain definitions. The County contends the Tom C. Dyke Veterans Park is not a public park as defined in one of the zoning code sections, which defines "Public Active Park/Playground/Recreational Area" as: "An outdoor area, along with its incidental buildings and structures, owned and/or operated by a public agency or a non-profit organization, which is designed, developed and intended to provide one or more recreational opportunities to the general public." (Def.'s Ex. 9 [San Diego County Zoning Ordinance § 1110].) A supporting declaration by the County's Land Use Chief states as follows:

4. In September 2004, I visited the VFW facility located in the Alpine area. The facility has a sign stating "Tom C. Dyke Veterans Park." There is no indication that this site is being used as a park. There are no recreational facilities of any type (picnic tables, trails, play equipment, etc.) on this site. In fact, the site is located on a fairly steep slope. There is no indication that the site is open to the public and I saw no members of the public at the site during my visit. Attached to the County of San Diego's Exhibits In Support Of Its Opposition To Plaintiffs' Motion For Summary Judgment as Exhibit 10 are true and correct copies of the photographs that I took during my visit to the VFW facility.

5. The County has determined that the "Tom C. Dyke Veterans Park" is not a park within the meaning of section

6930(b)(2) of the County's zoning ordinance, and is committed to that determination.

(Supplemental Hulse Decl., at 2.)

It is undisputed a park is located within 600 feet of two of the proposed sites. The parties disagree whether the park fits the meaning of the undefined term as used in the amended ordinance. The County does not provide any argument why section 1110, as opposed to some other definition of the term "park" in the zoning ordinance applies to interpret the amendment. Assuming section 1110 controls, the Court finds the County's evidence is insufficient to show the park does not meet the definition of that section. While neither side presented sufficient evidence to prevail on their respective cross-motions, the Court finds each side presented sufficient evidence to successfully oppose the other's summary judgment motion. Accordingly, a disputed issue of fact remains whether the two sites comprising Area 5 are unavailable for failure to meet the distance requirement.

### (ii) Long–Term Leases

Deja Vu contends some of the sites are unavailable because they are occupied by tenants with long-term leases. "[A] long-term lease may exclude a site from the commercial market." *Isbell,* 258 F.3d at 1113. Deja Vu's evidence consists of Mr. Luster's declaration regarding sites in Areas 3 and 6. (Luster Opp'n Decl., at 4.) The County objected to these portions of the declaration on the grounds of lack of personal knowledge, lack of foundation and hearsay. The Court agrees the pertinent statements are not admissible evidence. Only admissible evidence may be considered in deciding a motion for summary judgment. Fed.R.Civ.P. 56(e); *Beyene v. Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181–82 (9th Cir.1988). Deja Vu's argument based on long-term leases therefore lacks evidentiary support. Accordingly,

Deja Vu failed to meet its burden on its summary judgment motion, or to raise a genuine issue of material fact in opposition to the County's motion, on the issue whether any sites in Areas 3 and 6 are unavailable due to long-term leases.

### (iii) Physical Impediments to Use

Deja Vu next contends "[o]ne parcel in Area 2 is vacant land located in a river bed." (McLaughlin Decl., at 14.) The County maintains the parcel is almost three acres and at least a portion of it "would be suitable for construction of structures" even if part of it is located within a floodway. (Def.'s Opp'n, at 31–32.) The County's argument is weakened by Mr. Nevin's declaration, however, which asserts the site is "mostly located in the river bed." (Nevin Decl., Ex. A, Tab 2 (emphasis added).) On the other hand, Deja Vu's expert, Mr. McLaughlin, does not categorically state the site is in a floodway or on a flood plain, or could not be developed for some other reason.

It is undisputed the site is mostly located in the riverbed. The parties disagree whether it can be developed for a generic commercial enterprise. While neither side presented sufficient evidence to prevail on their respective cross-motions, the Court finds each side presented sufficient evidence to successfully oppose the other's summary judgment motion. Accordingly, a disputed issue of fact remains whether one site in Area 2 (parcel no. 281–182–14) could be developed.

Deja Vu next contends "Area 4 has one parcel (326–050–11) located on a steep hillside, which could not be developed, and many of the parcels have steep slopes which are often an impediment to urban development." (McLaughlin Decl., at 14.) The County argues the site is available because of its large size (53.34 acres) and an existing business on it. However, the

County's argument does not address the parcel identified by Mr. McLaughlin. While Mr. McLaughlin was referring to parcel no. 326–050–11, the County was referring to parcel no. 326–050–19. (*Cf.* McLaughlin Decl., at 14 and Def.'s Opp'n, at 31.) The exhibit to Mr. Nevin's declaration pertaining to parcel no. 326–050–11 shows the size of the parcel is 7.53 acres, states it has no buildings, notes "very steep lot," and contains a photograph of a steep undeveloped slope without even a billboard. (Nevin Decl., Ex. A, at 4–4.)

The Court therefore finds the County failed to raise a genuine issue of material fact in opposition to Deja Vu's summary judgment motion, and failed to meet the burden as the moving party on its motion with respect to parcel no. 326–050–11. Accordingly, the Court finds parcel no. 326–050–11 in Area 4 is unavailable. As to the remaining unidentified steep sites mentioned by Mr. McLaughlin, the Court finds Deja Vu failed to raise a genuine issue of material fact in opposition to the County's summary judgment motion, and failed to meet the burden as the moving party on its own summary judgment motion.

*(iv) Toxic Waste*

■ Deja Vu argues portions of some of the areas are unavailable because of toxic waste. The only evidence offered in support of this argument is Mr. McLaughlin's declaration:

It appears that hazardous wastes may be present on or around the sites in Areas 4 and 6, and Area 4 has warning signs posted that there are carcinogens present in the area. Hazardous wastes are also likely to be present in Areas 2, 3 and 7. These sites must be considered unavailable as alternative avenues of communication for Adult Use.

(McLaughlin Decl., at 15.)

However, the County points to Mr. McLaughlin's deposition testimony, arguing his opinion about unavailability due to the presence of hazardous wastes lacks foundation and proper basis. With respect to Areas 3 and 7, Mr. McLaughlin testified he did not observe anything or take any pictures indicating hazardous waste was present. (Def.'s Ex. 12 [McLaughlin Depo., at 107].) The Court therefore finds Deja Vu's argument lacks evidentiary support with respect to hazardous waste on any sites in Areas 3 and 7. However, as to Areas 4 and 6, Mr. McLaughlin testified he observed barrels and storage of derelict vehicles, which in his experience often generate hazardous waste. (*Id.* at 97–103, 105–07.) As to Area 2, he testified he based his opinion on the observation one site in Area 2 was used as a service station. (*Id.* at 107.) The Court notes exhibits to Mr. Nevin's declaration show several sites in Areas 2, 4 and 6 are occupied by various automotive businesses and junk yards. Mr. McLaughlin further testified he observed carcinogen signs on one site in Area 4. (*Id.* at 97–99.) The Court finds Mr. McLaughlin's deposition testimony provided sufficient basis for his opinions. This evidence is therefore admissible. The Court further finds it is sufficient to raise a genuine issue of fact regarding contamination of some of the sites in Areas 2, 4 and 6.

This issue of fact, however, is not material because, without any information regarding the extent of contamination, hazardous waste mitigation is generally a matter of the expense of developing a relocation site. The Ninth Circuit has not yet addressed the issue whether contamination could render a site unavailable; however, other courts have. *See, e.g., Centerfold Club. Inc. v. City of St. Petersburg,* 969 F.Supp. 1288, 1302 (M.D.Fla.1997) (irrelevant whether environmental contamination would make property more expensive to purchase, lease, or develop). Specifically, the Eleventh Circuit, following *Renton* and

relying in part on *Topanga Press*, held having to clean up hazardous waste generally is not an impediment to relocation of "constitutional magnitude" for purposes of reasonable alternative avenues of communication. *David Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1334–35 (11th Cir. 2000) (hazardous waste generated by a car repair business). As in *David Vincent*, there is not enough evidence in this case to support an inference the hazardous waste would be a prohibitive obstacle to relocation. *See id.* at 1335. This conclusion is reinforced by Mr. McLaughlin's own testimony, indicating hazardous waste contamination issues pervade the commercial real estate market, and environmental assessments are a normal part of commercial real estate transactions:

> Q. Isn't it fair to say, Mr. McLaughlin, that with respect to—if you are going to buy land these days, you're going to do—before you do that—a little due diligence on the environmental nature of the land?
>
> A. One would hope so.
>
> Q. Make sure there hasn't been—there isn't a hazardous waste problem?
>
> A. One would hope so.

(Def.'s Ex. 12 [McLaughlin Depo., at 107–08; *see also id.* at 105].) Since hazardous waste is essentially an economic issue inherent in the commercial real estate market, it cannot be considered for purposes of reasonable alternative avenues of communication. *See Topanga Press*, 989 F.2d at 1530. The mere presence of hazardous waste, without any evidence as to its extent or showing it is prohibitive to any generic commercial enterprise, is insufficient as a matter of law to render a site unavailable. Deja Vu therefore has failed to present sufficient evidence to raise a genuine issue of material fact in opposition to the County's summary judgment motion or to prevail on its own summary judgment motion as to this issue.

#### (v) Accessibility

Deja Vu contends a number of sites are not sufficiently accessible because they are landlocked, not accessible by roads serving commercial traffic, or lack public transportation. Although the Ninth Circuit has not yet considered whether a site with any of these characteristics is available, it has established a site must be reasonably accessible to the general public. *See Isbell*, 258 F.3d at 1113; *Lim*, 217 F.3d at 1055.

Deja Vu contends a number of sites in Areas 1, 7 and 8 are landlocked. A truly landlocked site is presumably not available because it would not be accessible to the general public. On the map, all the sites identified by Deja Vu appear landlocked. However, the County's evidence suggests the sites are accessible. As to sites in Area 1 (parcels no. 141–210–23 and 141–210–09), its photographs show they are accessible by a dirt road. (Nevin Decl., at 2 & Ex. A, Tab 1.) As to sites in Area 7 (parcels no. 483–022–35, 483–071–05, 483–071–09), the photographs show cars, existing businesses and structures. (*Id.* Tab 7.) Although the County's evidence is circumstantial, it is more substantial than a mere "scintilla of evidence" raising "some metaphysical doubt as to material facts." *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Reasonable inferences which can be drawn from it support the County's claim the sites are not landlocked. Deja Vu does not address this evidence. As the burden is on Deja Vu to show a site would not reasonably become available, the Court finds it failed to present sufficient evidence to prevail on its summary judgment motion or to raise a genuine issue of material fact in opposition to the County's motion with respect to sites in Areas 1 and 7.

As to the sole site in Area 8, the County makes no argument and points to no evidence suggesting it is accessible. The

photograph of the site does not show the presence of any road, vehicle or functional structure, and it is not clear from the map of the area whether the site abuts a road. (Nevin Decl., Ex. A, Tab 8). Neither side presented any evidence regarding the existence of easements, which may render an apparently landlocked parcel accessible or inaccessible. With respect to the sole site in Area 8, the Court therefore finds neither side presented sufficient evidence in support of its respective summary judgment motion.

Deja Vu next contends Areas 3 and 5 are only accessible by roads which do not serve commercial traffic. (McLaughlin Decl., at 15.) Deja Vu does not contend these areas are not accessible by a road. The County's evidence shows Area 3 as a developed office park near Rancho Bernardo. The photographs show roads, parking lots and cars. (Nevin Decl., Ex. A, Tab 3.) The aerial photograph of the two sites comprising Area 5 shows them abutting Tavern Road. (*Id.* Tab 5.) Deja Vu does not attempt to rebut the County's evidence or explain why these areas are not accessible to the public in general, or commercial traffic in particular. As the burden is on Deja Vu to show a site would not reasonably become available, the Court finds it failed to present sufficient evidence to prevail on its summary judgment motion or to raise a genuine issue of material fact in opposition to the County's motion with respect to accessibility of the sites in Areas 3 and 5.

Deja Vu next contends Areas 3, 6, and 7, or portions thereof, are unsuitable for commercial use because adequate parking is not available. (McLaughlin Decl., at 13.) A site must comply with the zoning ordinance in question to be available. *Isbell*, 258 F.3d at 1113 n. 3; *Lim*, 217 F.3d at 1055. Deja Vu's argument is undercut by its expert's deposition testimony. Mr. McLaughlin admitted, at least as to some

of the sites, parking garages could be built above the surface parking lots, underground parking structures could be built below the buildings, or a commercial business could use a nearby parcel to provide parking for the site. (Def.'s Opp'n, at 34 (citing Ex. 12, at 51–52, 55, 57–60; Ex. 13 [Zoning Ordinance § 6785(a) ] ).) With respect to these sites, the parking issue does not go to the availability of the site, but to the economic impact of relocation on the site, an issue which cannot be considered in this analysis. *Topanga Press*, 989 F.2d at 1529. Deja Vu does not address Mr. McLaughlin's testimony in its papers. Furthermore, the photographs of many of the sites in these areas show vacant surface parking. (Def.'s Opp'n, at 34 (citing Nevin Decl., Ex. A, Tabs 3, 6 & 7).) Deja Vu does not address this evidence. As the burden is on Deja Vu to show a site would not reasonably become available, the Court finds it failed to present sufficient evidence to prevail on its summary judgment motion or to raise a genuine issue of material fact in opposition to the County's motion with respect to parking for the sites in Areas 3, 6 and 7.

Last, Mr. McLaughlin makes a cryptic remark in his declaration that "[n]o public transit is apparent in any of the Areas." (McLaughlin Decl., at 15.) Deja Vu does not elaborate on this in its points and authorities, and offers no case law to suggest public transportation is necessary before a site is considered accessible. The Court's own research has revealed no authority necessitating access by public transportation. Since Deja Vu does not argue public transit is necessary, this issue is waived for purposes of this motion. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir.2003).

*(vi) Other*

Mr. McLaughlin also opined one site in Area 7 is not available because the build-

ing on the site straddles parcel lines "in a way that disqualifies most of the structure and a portion, if not all, of the one store-front that might otherwise qualify as an Adult Use site." (McLaughlin Decl., at 13–14.) This is another point Deja Vu does not elaborate on in its points and authorities. Since Deja Vu does not present any argument or legal authority to show why this site is unavailable, this issue is waived for purposes of this motion. *See Indep. Towers of Wash.*, 350 F.3d at 929.

Based on the foregoing, three of the thirteen sites in Area 4 (parcels no. 326–050–11, 326–050–12 and 326–060–18) and one of the fourteen sites in Area 7 (parcel no. 483–071–11) have been disqualified. In addition, issues of fact exist as to one of the eighteen sites in Area 2 (parcel no. 281–182–14), both sites comprising Area 5, and the sole site in Area 8.

#### b. Sufficiency of the Available Sites

"Once the areas that are not part of the market are excluded, the question becomes whether the remaining acreage provides the Adult Businesses with a reasonable opportunity to relocate." *Topanga Press*, 989 F.2d at 1532. "There is no constitutional requirement that [the government] make available a certain number of sites." *Diamond*, 215 F.3d at 1056.

The parties disagree as to the method the Court should apply to address this issue. The four Ninth Circuit decisions applying the *Renton* standard have addressed two types of cases. In *Walnut. Properties* and *Topanga Press*, the Ninth Circuit addressed the situation where numerous adult entertainment businesses were competing for a relatively small number of available relocation sites. In *Walnut Properties,* thirteen existing businesses were presented with a "small handful" of available sites which could operate simultaneously in light of the 1,000–foot separation requirement. 861 F.2d at

1103, 1108. The court held this did not allow for reasonable alternative avenues of communication. *Id.* at 1110. Similarly in *Topanga Press,* at least 102 adult entertainment businesses were competing for approximately 120 available sites, which could not operate simultaneously due to the 1,000–foot separation requirement. 989 F.2d at 1533. The court again found this was not sufficient. *Id.*

On the other hand, in *Young v. City of Simi Valley* and *Diamond,* the court was faced with a situation where the first adult entertainment applicant sought a permit under a new zoning ordinance. In *Young,* four available sites, which could operate simultaneously, were held sufficient as a matter of law for the location of the sole applicant in the absence of any evidence the ordinance otherwise had a chilling effect. 216 F.3d 807, 811, 818 n. 10, 822–23 (9th Cir.2000). In *Diamond,* the court held the separation requirement was irrelevant in determining the number of sites because there was only one applicant, and held a total of seven available sites was constitutionally sufficient. 215 F.3d at 1056–57.

It is undisputed only Deja Vu is in need of a relocation site. Three adult entertainment businesses have ever operated in the unincorporated San Diego County: Fantasyland, Deja Vu, and Innspot East, which was annexed into the City of Lemon Grove in 1981. All three businesses are still in existence. There have never been any other adult entertainment businesses in the unincorporated San Diego County. Only Innspot East and Deja Vu applied for an adult entertainment license in the last 25 years. Fantasyland was exempt from this requirement pursuant to a settlement with the County. (*See* Pelowitz Decl., at 1–2.) At the time the ordinance was amended, only Fantasyland and Deja Vu were operating in the unincorporated San

Diego County. (Joint Stmnt of Undisputed Facts, at 5.) It is undisputed Fantasyland is exempt from the requirements of the amended zoning ordinance pursuant to the settlement, which leaves only Deja Vu in need of a relocation site. (*See* Pls.' Joint Opp'n, at 26 n. 24.)

Neither side presented any evidence of additional businesses or individuals interested in operating an adult entertainment business in the unincorporated area of the San Diego County. Given the small number of businesses ever to apply for an adult entertainment license, the Court finds the fact Deja Vu is not the first business ever to apply, but is the sole business required to relocate after the amendment, is a distinction without a difference. Accordingly, the instant case is factually more akin to *Young* and *Diamond* than to *Topanga Press* and *Walnut Properties*.[12]

After the four excluded sites are accounted for, 72 of the 76 sites remain available. If the four additional sites as to which there is an issue of fact are also excluded for purposes of the analysis, 68 sites remain available in six areas: 1, 2, 3, 4, 6 and 7. It is undisputed due to the 1,000–foot separation requirement between adult entertainment businesses, Areas 1, 3 and 6 can simultaneously support only one adult entertainment business each. (McLaughlin Decl., at 15; Hulse Decl., at 3.) It is also undisputed Area 4 is large enough for two businesses to operate simultaneously, provided they are located at opposite ends of the area. (*Id.*) However, if an adult entertainment business were to locate in the center of Area 4, then only one business could operate in that area.

(McLaughlin Decl., at 15.) The parties disagree on how many adult entertainment businesses could operate simultaneously in Areas 2 and 7. The County's evidence shows up to three businesses could operate simultaneously in Area 3, while Deja Vu's evidence shows only up to two could operate simultaneously. (*Cf.* Supplemental Hulse Decl., at 2; Def.'s Ex. 14 *and* McLaughlin Decl. at 15.) As to Area 7, the County's evidence shows it could support up to two businesses simultaneously, while Deja Vu's evidence shows it could support only one. (*Cf.* Supplemental Hulse Decl., at 2; Def.'s Ex. 15 *and* McLaughlin Decl., at 15.) Accordingly, if Deja Vu's evidence is believed, at most eight adult entertainment businesses can operate simultaneously on the total 68 sites. Deja Vu does not contend Fantasyland's present location further diminishes the number of sites which can operate simultaneously. If the County's evidence is believed, the largest possible number of simultaneously occupied sites is ten. Since only Deja Vu seeks a relocation site, it can choose among all the available sites. No matter which party's evidence is believed, the number of sites which could be simultaneously occupied by adult entertainment businesses in this case is greater than the number found sufficient in *Diamond* and *Young*.

However, "[d]ata regarding the number of sites available for adult use is meaningless without a contextual basis for determining whether that number is sufficient for that particular locale." *Young*, 216 F.3d at 822. Supply and demand, therefore "should be only one of several factors that a court considers when deter-

---

12. *Diamond* and *Young* each approached differently the issue which number of sites is relevant when only one business seeks a location. In *Diamond*, the court applied the total number of available sites, and in *Young* it applied the number which can operate simultaneously under the separation requirements of the zoning ordinance. Although the two approaches result in a vastly different number of sites in this case, the Court finds the difference is not relevant. For purposes of this analysis, the Court will follow the approach taken in *Young*, as the more recent of the two cases.

mining whether an adult business has a 'reasonable opportunity to open and operate' in a particular city." *Id.* (quoting *Topanga Press,* 989 F.2d at 1529). "A court should also look to a variety of other factors including, but not limited to, the percentage of available acreage theoretically available to adult businesses, the number of sites potentially available in relation to the population, community needs, the incidence of [adult businesses] in other comparable communities, [and] the goals of the city plan." *Young,* 216 F.3d at 822 (internal quotations omitted).

 The parties presented evidence of the percentage of the available acreage and the number of potentially available sites in relation to the population in the unincorporated San Diego County. The parties agree the unincorporated area encompasses 2,286,059 acres, with 2,318.66 acres zoned for industrial use. In addition, the County offers, and Deja Vu does not dispute, 2,764.86 acres are zoned for commercial use. After the four disqualified sites are accounted for, the 72 remaining sites amount to a total of 235.16 acres available for adult entertainment use. If the additional four sites as to which there are questions of fact are also excluded, the remaining acreage is 227.03. The parties disagree whether the relevant comparison is between the available sites and the total acreage of the unincorporated area, or the total acreage which could potentially be available to adult entertainment businesses if it were not for the amended zoning ordinance. While *Young* states the pertinent factor is "the percentage of available acreage theoretically available to adult businesses," 216 F.3d at 822, it does not expressly answer this issue. Furthermore, in *Walnut Properties,* the court relied on the acreage of the entire municipality. *See* 861 F.2d at 1108; *see also Renton,* 475 U.S. at 53, 106 S.Ct. 925. The issue presented here, however, was not addressed in either case, and the choice was made without discussion. The purpose of the comparison ultimately is to determine whether an adult business has a "reasonable opportunity to locate," and the focus is on the "actual business real estate market" where a generic commercial enterprise could potentially operate. *See Isbell,* 258 F.3d at 1112–13. The Court therefore finds the areas which would not be available to a generic business should be excluded. In this case, the relevant comparison is therefore made between the acreage of the available sites and the total industrially- and commercially-zoned acreage in the unincorporated area, which totals 5,083.52 acres. Based on this comparison, Deja Vu will be able to consider sites located on 4.46% of the total industrially and commercially zoned acreage.

In comparing the acreage available to adult entertainment businesses to the population, the parties disagree about the population of the unincorporated area. Deja Vu bases its comparison on 674,440 people, taken from a population summary chart on the County's website. (*See* McLaughlin Decl., at 5.) The County, relying on the estimate of the California Department of Finance, contends the population is 470,-000 as of January 1, 2004. (Def.'s Opp'n, at 36 (citing Manicom Decl., at 3 & Ex. 1; Def.'s Ex. 16).) However, when the population summary chart on the County's website is examined, it shows an existing population of 446,080 based on the 2000 census, and a population of 674,440 under the heading of "April 2004 Working Copy." (Def.'s Ex. 17.) The County explains this heading refers to "the maximum population (674,440) the unincorporated area of the County will be able to accommodate if the Proposed General Plan is enacted by the Board of Supervisors." (Supplemental Hulse Decl., at 3.) Deja Vu does not address the County's explanation, and does not offer any explanation why it chose this population number. It is plain the pertinent population number is the existing

population, most recently estimated at 470,000. Based on the actual population, the 227.03 acres of potentially available sites amounts to approximately 4.83 acres per 10,000 persons.[13]

In its opposition to the County's motion, Deja Vu offers a comparison chart comparing the acreage and population statistics of this case to those of *Walnut Properties* and *Renton*. The comparison, however, is irrelevant as a matter of law because each case must be examined on its own facts. *See Young*, 216 F.3d at 821, 822 ("*Renton* requires a case by case analysis;" the inquiry is "whether that number is sufficient for that particular locale"). Furthermore, neither in *Renton* nor in *Walnut Properties* were the circumstances analogous to the unincorporated County. In *Walnut Properties* thirteen businesses were vying for "a small handful" of sites, with supply apparently not meeting the demand. 861 F.2d at 1104, 1108. On the other hand, in *Renton* the supply was far greater than the demand. 475 U.S. at 52–53, 106 S.Ct. 925. For all of the above reasons, the statistics which can be derived from these two cases cannot be viewed as defining the scope of what constitutes reasonable alternative avenues of communication in this case.

Given the evidence presented by the parties, including the history of scant demand for adult entertainment licenses, the lack of evidence showing others wish to open an adult entertainment business in the unincorporated County, the number of potentially available sites and their acreage, the total industrial and commercial acreage and population in the unincorporated area, the Court finds the County met its burden in opposition to Deja Vu's summary judgment motion and in support of its own summary judgment motion to show the number of sites available to adult entertainment businesses under the amended ordinance is sufficient to provide reasonable alternative avenues of communication.[14]

## C. Procedural Safeguards

The amended ordinance requires an administrative permit to establish, operate, enlarge, or transfer ownership or control of an adult entertainment establishment. A permit application must be approved if the adult entertainment business location meets the distance and separation requirements of the amended ordinance. Deja Vu challenges the provision of the amended ordinance, which outlines the applicable administrative permit procedure, claiming it fails to provide for a "timely decision" on an application and precludes prompt access to the courts. (Pls.' Joint Mot., at 26.) The County maintains the ordinance requires it to act on a permit application within a reasonable time, and the time allowed for the County to consider an appeal is also reasonable. The County moves for summary judgment and a finding the permit application process of the amended ordinance is constitutional. Deja Vu cross-moves for a finding it is an unconstitutional prior restraint on speech.

---

13. Deja Vu's calculation, based on a population of 674,440 and available adult entertainment acreage of 233.4 acres, appears to be in error, even if the Court were to accept its underlying premises. Deja Vu contends these numbers yield 0.35 acres per 10,000 persons. (Pls.' Joint Mot., at 30.) The correct calculation is: 233.4 acres divided by 674,440 persons, multiplied by 10,000 persons, which yields 3.46 acres per 10,000 persons.

14. For purposes of reaching this conclusion, the Court assumed Deja Vu could disqualify at trial the four sites as to which it raised an issue of fact. Accordingly, the factual issues pertaining to those sites are not material, because they could not affect the outcome of this case. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In *FW/PBS, Inc. v. City of Dallas*, the plaintiffs challenged a licensing ordinance for adult entertainment businesses. 493 U.S. 215, 220, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). "A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id.* at 227, 110 S.Ct. 596. Two essential procedural safeguards are required for a valid licensing scheme. *Id.* First, "the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained." *Id.* at 228, 110 S.Ct. 596. Second, "there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *Id.*; see also *City of Littleton v. Z.J. Gifts D–4. L.L.C.*, 541 U.S. 774, 781–82, 124 S.Ct. 2219, 159 L.Ed.2d 84 (2004).

Under the licensing scheme in *FW/PBS*, licenses were to be issued within thirty days following the receipt of an application, and after the premises were inspected and approved by the health, fire, and building officials. There was no time limit for completing the inspections, and applicants had no way to ensure the inspections would occur within the thirty-day period. *FW/PBS*, 493 U.S. at 227, 110 S.Ct. 596. As a result, a license could be postponed indefinitely. *Id.* at 229, 110 S.Ct. 596. The ordinance was found unconstitutional because it did not "provide for an effective limitation on the time within which the licensor's decision must be made," and because it failed "to provide an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial." *Id.*

The principles discussed in *FW/PBS* were applied by the Ninth Circuit in *Kev,* *Inc. v. Kitsap County.* The ordinance in *Kev* required erotic dancers and operators of erotic dance studios to obtain licenses, but there was a five-day waiting period to obtain licenses after filing applications. 793 F.2d at 1060. Because the government "failed to demonstrate a need" for curtailing the dancers' First Amendment rights for five days while an application was pending, the court declared the five-day waiting period for dancers unconstitutional. *Id.* The five-day waiting period for the operators was found constitutional because the government "presented a sufficiently compelling justification." *Id.* at 1060 n. 6. The government anticipated topless dancing establishments were likely to require a "significant reallocation of law enforcement resources," and five days was a reasonable time for the government to make adjustments given its limited resources. *Id.* The court also noted there was "no reason for a new studio operator not to apply for a license one week before he plans to open his facility." *Id.* Accordingly, *Kev* places the burden on the government to explain the time period it needs to decide whether to grant or deny a license application. *Kev,* 793 F.2d at 1060.

In this case, the parties do not agree what period of time is allowed under the amended ordinance to make a licensing decision. Deja Vu contends the County has eighty days to act on an application plus another sixty days to consider an appeal, for a total of 140 days. The County maintains it has seventy days to make the decision on a permit application plus sixty days to consider an appeal, for a total of 130 days. This factual dispute is not material. Even if the Court assumes the County is correct, and the applicable period is 130 days,[15] the County presented no

---

15. The parties' respective calculations of the time period are as follows: The amended zoning ordinance states in pertinent part, a permit application "shall be acted upon by the Director following a public hearing within forty (40) days following receipt of the complete application pursuant to Section 65943 of

evidence to show why it needs so much time and why this period is reasonable.

Because permit issuance is conditioned solely on a finding of compliance with non-discretionary distance criteria, *i.e.*, the distance and separation from specified land uses, Deja Vu argues the time to rule on the permit application "exceeds the brief, reasonable period contemplated by *FW/PBS* for a permit decision." (Pls.' Joint Mot., at 26.) On the other hand, the County contends thirty days to determine whether a permit application is complete is not "subject to the *FW/PBS* time limitation," and the forty days to make a decision meets the reasonableness standard based on subsequent case law, which found longer time periods constitutional. The County cites no relevant authority to support its argument the thirty days to determine whether an application is complete should not be counted for purposes of the reasonableness inquiry under *FW/PBS*. The standard set forth in *FW/PBS* re-

quires the procedure "provide for an effective limitation on the time within which the licensor's decision must be made" and "provide for prompt judicial review," which suggests it would be relevant to consider all applicable time periods from the submission of the application until judicial review becomes available to the applicant. 493 U.S. at 229, 110 S.Ct. 596.

The County also cites three cases to support its argument: *Redner v. Dean*, 29 F.3d 1495 (11th Cir.1994); *TK's Video v. Denton County, Tex.*, 24 F.3d 705 (5th Cir.1994); *Wolff v. City of Monticello*, 803 F.Supp. 1568 (D.Minn.1992). None of these cases supports the County's position.

The ordinance at issue in *Redner* placed a 45–day time limit on the government's decision to grant or deny an application, which was found constitutionally reasonable.[16] 29 F.3d at 1497–98, 1501. In the 45 days, the government was to determine whether the adult entertainment business

the Government Code .... The director shall make his ruling within ten (10) days following the hearing." (LR, at 24 [Ordinance No. 9469, § 6930(b)(1)].) In pertinent part, California Government Code Section 65943(a) states:

> Not later than 30 calendar days after any public agency has received an application for a development project, the agency shall determine in writing whether the application is complete and shall immediately transmit the determination to the applicant for the development project. If the written determination is not made within 30 days after receipt of the application, ... the application shall be deemed complete ....

The time limit for the County to act on a permit application begins to run when the application is "accepted as complete." *Ni Orsi v. City Council of the City of Salinas*, 219 Cal.App.3d 1576, 1585, 268 Cal.Rptr. 912 (1990).

Although the Director can act sooner, he or she can wait thirty days until the permit application is deemed complete by operation of law. At that time, the forty days in which the Director must hold a public hearing begins to

run. Assuming the Director holds the hearing on the fortieth day, the Director must make a ruling within ten days following the hearing. Thus, the County can take as many as eighty days (*i.e.*, 30 + 40 + 10) to make a decision on a permit application. If an administrative permit is denied, the County then has another sixty days to make a determination on an appeal, which means an applicant could potentially be unable to seek judicial review for 140 days (*i.e.*, 30 + 40 + 10 + 60). The County's interpretation of these two sections results in a maximum 130–day period because the County contends the ten-day period for issuing a decision "is not tacked on to the earlier 40–day period." (Def.'s Opp'n, at 24.)

16. The court found the ordinance unconstitutional because of two other provisions which created the risk expressive activity could be suppressed for an indefinite period of time: the ordinance only provided the applicant "may be permitted" to begin operating if the government did not make a decision within 45 days, and the ordinance only provided for an appeal to be heard *"as soon as the Board's calendar will allow." Id.* at 1501.

complies with the building, fire, health and zoning regulations. *Id.* at 1497. The *Redner* ordinance is distinguishable because all the County has to do before deciding whether to issue a permit in this case, is to determine whether the business meets the distance and separation requirements of the zoning ordinance. (*See* LR, at 25 [Ordinance No. 9469, § 6930(b)(2) ].)

*TK's Video* is distinguishable for the same reasons as *Redner.* The licensing ordinance in *TK's Video* provided the government sixty days following receipt of an application to issue an operating license, unless certain disqualifying factors were found. 24 F.3d at 708. This did not place an undue burden on speech because "[l]icensing entails reviewing applications, performing background checks, making identification cards, and policing design, layout, and zoning arrangements." *Id.* This case is distinguishable because the County's application review entails only the determination if the distance and separation requirements are met, and does not include the kind of checks which justified a longer time frame in *TK's Video.*

In *Wolff,* the operator of an adult video store challenged an ordinance which allowed the government ninety days to grant or deny a license. 803 F.Supp. at 1570, 1574. The district court noted "[t]he ninety-day time period prescribed in the ordinance does not appear to be unreasonable per se." *Id.* at 1574. However, it nevertheless found the ordinance unconstitutional because it made "no provision for the continued operation of an existing adult use pending the completion of the application process." *Id.* at 1575.

The County's cases do not reach the heart of the issue raised by Deja Vu: the reasonableness of the delay to issue permits under the circumstances of this case. Compliance with the distance and separation requirements, the only factor in the permit decision, can be quickly verified

through the County's GIS system, which measures the distance between two points. (*See, e.g.,* Supplemental Hulse Decl., at 2.) In addition, Deja Vu submitted a copy of a Final Decision of the Zoning Administrator dated August 9, 2001, which indicates on one occasion the Director made a final determination on an administrative permit application only nine days after it was received for processing. (Manicom Reply Decl., Ex. 5.) Deja Vu also points to the San Diego Municipal Code Section 123.0306, which requires the City Manager to approve or deny an application for a Zoning Use Certificate for an adult entertainment establishment in only fifteen business days after receipt.

On the other hand, the County has offered no evidence to show why it needs 130 days for the entire process. The only explanation it presented for the lengthy time frame is the unsupported statement the sixty days allowed to consider an appeal is reasonable "given the fact an appeal to the County's elected Board is involved."

The Court therefore finds the County presented no evidence to show the time period for issuing a permit pursuant to the amended ordinance is reasonable, an issue as to which it bears the burden at trial. Due to the lack of evidence on this point, the County failed to meet its burden as the moving party on summary judgment, and has also failed to raise a genuine issue of material fact in opposition to Deja Vu's cross-motion. The Court finds Ordinance No. 9469, Sections 6930(b)(1) and 7064, unconstitutional, to the extent it fails to impose reasonable time limits on the decisionmaker to act on administrative permit applications, as required by *FW/PBS.*

■ Neither party addresses whether invalidating the time periods specified in sections 6930(b) and 7064 results in striking the entire ordinance or severing the

unconstitutional provisions. The Legislative Record provided by the County does not include a severability clause applicable to Ordinance No. 9469. However, its absence does not automatically preclude severance. *See Barlow v. Davis,* 72 Cal. App.4th 1258, 1264, 85 Cal.Rptr.2d 752 (1999). The severability "determination depends on whether the remainder is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute." *Id.* (internal quotation marks, citations and alterations omitted). Based on the Legislative Record, and review of the affected ordinance, the Court finds the unconstitutional procedural provisions severable. Specifically, the remainder of the ordinance (the substantive zoning provisions) is sufficiently complete in itself, and the County likely would have adopted the amended zoning ordinance, even if it had foreseen some of its procedural provisions would be invalidated.

### D. Spot Zoning

Deja Vu alleges the County enacted the zoning amendments "solely for the illegitimate purpose of forcing Plaintiffs to cease their authorized use of the Property, rather than for any legitimate governmental purpose." (First Am. Compl., at 15.) Deja Vu moves for summary adjudication of this claim, and argues the County's zoning ordinance amendments are a clear case of "invalid spot zoning," which should be enjoined from enforcement. (Pls.' Joint Mot., at 31.) The motion is based on comments made by legislators before enacting the amendment, and on the fact Deja Vu is the only adult entertainment business which must relocate as a result of the amendment. Deja Vu acknowledges courts will not generally look to the motives of legislators in enacting an ordinance, but argues an exception applies "in cases involving spot zoning or discrimination against an individual or a particular

land parcel." (*Id.*) In opposition, the County points to Deja Vu's evidence to argue the County did not have any particular adult entertainment business in mind when it enacted the amendment. The County presented no evidence of its own.

Deja Vu relies on California law, which recognizes a claim for discrimination against a particular parcel of property. *See, e.g., G & D Holland Constr. Co. v. City of Marysville,* 12 Cal.App.3d 989, 994, 91 Cal.Rptr. 227 (1970) ("The principle limiting judicial inquiry into the legislative body's police power objectives does not bar scrutiny of a quite different issue, that of discrimination against a particular parcel of property" and "the courts will give weight to evidence disclosing a purpose other than that appearing upon the face of the regulation" "where 'spot zoning' or other restriction upon a particular property evinces a discriminatory design against the property user"). However, Deja Vu does not allege a California spot zoning claim in its complaint. Instead, it alleges the amendment violates the freedom of speech provisions of the federal and California constitution. (First Am. Compl., at 20–21, 23.) As the spot zoning under California common law is not alleged in the complaint, and Deja Vu does not seek to amend it, its motion for summary judgment is denied to the extent it is based on this claim.

█ In the alternative, even if Deja Vu alleged a spot zoning claim under California law, the evidence it presented is insufficient to meet its burden as the moving party on summary judgment. Since Deja Vu would bear the burden of proof at trial as to its spot zoning claim, it "must make a showing sufficient for the Court to hold that no reasonable trier of fact could find other than for the moving party," and "must establish beyond peradventure all of the essential elements of the claim ... to

warrant judgment in its favor." *Pecarovich*, 272 F.Supp.2d at 985 (internal quotation marks, alterations and citations omitted); *see also C.A.R. Transp. Brokerage*, 213 F.3d at 480.

Deja Vu relies on two pieces of evidence in support of its spot zoning claim. First, it relies on a memorandum to the Board of Supervisors from two members wishing to add an item to an agenda "Getting Tough on Adult Entertainment Establishments." (Manicom Decl., Ex. 2, at 1.) The memorandum expresses dissatisfaction with the "current process" for "the citing of Adult Entertainment Establishments" because there is no provision for "public input and notification." (*Id.* at 2.) The last paragraph states:

> The County must protect its citizens by creating the most restrictive ordinance possible within the boundaries of the law. While the Major Use Permit will allow for public input, the County must do everything within its authority to minimize the adverse impacts caused by Adult Entertainment Establishments. Rewriting the current ordinance will further protect unincorporated citizens.

(*Id.*) Deja Vu also cites comments by Supervisor Jacob during a meeting of the County Board of Supervisors on June 12, 2002:

> A few months ago it came to our attention that we had a defective ordinance in regards to adult entertainment establishments and that's why in March, the Board of Supervisors unanimously directed our staff and our legal counsel to come back with the toughest, the strictest ordinance and regulations for adult entertainment businesses that we could possibly have that would be upheld if challenged in a court of law. . . .
>
> \* \* \* \* \* \*
>
> These establishments, first of all, are not wanted in any of the communities and I think that is a foregone conclusion. But the courts have ruled that we must allow them in certain areas and we do know that we had a zoning ordinance that was invalid and therefore what that created is that every piece of property in every zone, whether it be residential, commercial, industrial, was fair game for the establishment of an adult entertainment business. So, with what we have before us, in my view does meet the test of being the toughest, the most restrictive ordinance and regulations that we can have that have been court tested. I think that it is critical that our regulations stay within the boundaries of the law. They must be defensible. Otherwise the County is not able to enforce and to, bottom line, to protect our children and our communities. This will, I think, within the constitutional rights that are guaranteed by the courts, will protect our communities as much as possible. I think that the next most important thing is . . . to have aggressive enforcement. . . .

(LR, at 1931–38.)

Contrary to Deja Vu's assertion, these statements are not susceptible to an interpretation that would yield a scintilla of evidence or a reasonable inference the County was discriminating against it. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. To the contrary, the only reasonable interpretation is the County intended the zoning ordinance as amended to apply to all adult entertainment businesses. Although it appears Deja Vu has been affected disproportionately because it is the only business which must change its location, all adult entertainment businesses are subject to the same restrictions, and there is nothing to suggest Deja Vu was singled out. Consequently, Deja Vu has failed to meet its burden as the moving party on summary judgment with respect to a spot zoning claim under California law.

To the extent Deja Vu intended to base its motion consistently with its complaint on a spot zoning claim under the free speech provision of the First Amendment, *Renton* rejected a similar argument. The Supreme Court reversed a Ninth Circuit finding that the predominate concern with secondary effects of adult entertainment businesses was not enough to sustain the ordinance:

> According to the Court of Appeals, if "a *motivating factor*" in enacting the ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision. This view of the law was rejected in *United States v. O'Brien*, the very case that the Court of Appeals said it was applying:
>
> > "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive...."
>
> . . . . .
>
> > "... What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."

*Renton*, 475 U.S. at 47–48, 106 S.Ct. 925 (internal citations omitted) (quoting *O'Brien*, 391 U.S. at 383–84, 88 S.Ct. 1673). For the foregoing reasons, Deja Vu's motion for summary judgment on the spot zoning claim is denied.

## VII. Licensing and Registration Requirements

In their respective operative complaints, all plaintiffs challenge on its face the constitutionality of those sections of the amended ordinance, which require all adult entertainment establishments and their owners, managers, performers, and employees to obtain a license, and which additionally require each entertainer and each manager to complete a registration form before starting work.[17] Plaintiffs contend these requirements constitute an unconstitutional restriction on the time, place, and manner of protected speech, and fail to provide for constitutionally-required procedural safeguards under the freedom of speech, press and expression provisions of the federal and California constitutions. The County moves for summary judgment of plaintiffs' challenges, and all plaintiffs cross-move for summary judgment of this claim.

Licensing requirements, such as the licensing provisions of the amended ordinance in this case, are considered prior restraints on speech, and are presumptively unconstitutional:

> A licensing scheme regulating [adult entertainment] is considered a prior restraint because the enjoyment of protected expression is contingent upon the approval of government officials. While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing a heavy presumption against its constitutional validity. Like other regulations upon [adult entertainment], prior restraints can be imposed only if they are reasonable time, place and manner restrictions. In addition, an adult entertainment li-

---

17. According to plaintiffs, a "stay of enforcement" has been in effect as to the licensing requirements since the outset of this litigation. As a result, the licensing requirements have not actually been applied to them. Plaintiffs reserve the right to bring "as applied" challenges should a controversy arise in the future. (Pls.' Joint Mot., at 7 n. 4.)

censing scheme must contain at least two procedural safeguards. First, a decision to issue or deny a license must be made within a brief, specified and reasonably prompt period of time. Second, there must be prompt judicial review in the event a license is denied.

*Clark v. City of Lakewood,* 259 F.3d 996, 1005 (9th Cir.2001) (internal citations omitted). The instant cross-motions raise three issues pertaining to the licensing requirements: (1) whether plaintiffs have standing to challenge some of the provisions; (2) whether the licensing requirements constitute reasonable time, place, and manner restrictions; and (3) whether they provide sufficient procedural safeguards.

### A. Standing

The County contends all plaintiffs lack standing to the extent they challenge the licensing provisions, which prohibit issuing a license to any minor or to any "officer, director, general partner or other person who will manage or participate directly in the decisions relating to management and control of the business" and who has been convicted of specified crimes. Any plaintiff challenging the licensing provisions on these grounds would have to show he or she was either a minor or convicted of a specified crime. *See FW/PBS,* 493 U.S. at 233–34, 110 S.Ct. 596. None of the plaintiffs made a showing along these lines. However, upon review of plaintiffs' papers, it is apparent they do not challenge the licensing provisions on these grounds. The County's standing argument is therefore inapplicable in this case.

### B. Reasonable Time, Place, and Manner Restriction

Plaintiffs contend the licensing provisions are unconstitutional for three reasons: (1) they are unnecessarily burdensome and redundant; (2) they require disclosure of personal information which could potentially be made publicly available under California law; and (3) obtaining and maintaining a license depends on compliance with the hours-of-operation, interior configuration and zoning provisions, which plaintiffs maintain are unconstitutional. As to the last argument, the Court has determined above the hours-of-operation, interior configuration and substantive zoning provisions are constitutional, and therefore rejects plaintiffs' challenge to the licensing and registration requirements to the extent it is based on those provisions.

### 1. Narrowly Tailored—Burdensome and Redundant

▮ Plaintiffs argue the licensing requirements are broader and more onerous than justified by the significant governmental interests the County intended to address. The dispute is therefore focused on the issue whether the County's licensing requirements are "narrowly tailored" to "serve a substantial government interest" under *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925.

The purpose of the amended licensing provisions in large part is to ensure no minors or individuals convicted of certain crimes, such as drug dealing, prostitution, rape, or pandering, work in adult entertainment establishments, to facilitate identification of witnesses and suspects connected to criminal activity found to be associated with adult entertainment businesses, and to curtail the spread of sexually-transmitted diseases. (*See* LR, at 142–45 [Ordinance No. 9479, § 21.1801(B)(1)-(25)].)

Plaintiffs first contend the requirements are unduly burdensome because each corporate officer, director, general partner or other person involved in management directly participating in management decisions or control of the business must per-

sonally appear at the Sheriff's office to file the establishment license application. The County's opposing argument is although these individuals must each sign the application, only one must personally appear at the Sheriff's office. While this would be a sensible approach, it does not find support in the language of the ordinance:

> (F) ... If a person who wishes to operate an adult entertainment establishment is other than an individual, each officer, director, general partner or other person who will manage or participate directly in the decisions relating to management and control of the business shall sign the application for a license as applicant. Each applicant must be qualified under Section 21.1804 and each applicant shall be considered a licensee if a license is granted.

(LR, at 149, 151 [Ordinance No. 9479, § 21.1803].) The definition of the term "licensee" includes "the individual or individuals listed as an applicant on the application for a[n] adult entertainment establishment license." (*Id.* at 147 [§ 21.1802(F)].) These provisions, read together, clearly indicate each officer, director, general partner or manager is an "applicant." Under subsection (C), each applicant must file the application in person:

> An applicant for an adult entertainment establishment license ... shall file in person at the office of the County Sheriff a completed application made on a form provided by the County Sheriff. The application shall be signed by the applicant.

(*Id.* at 149 [§ 21.1803(C)].)

The Ninth Circuit has not yet addressed the issue whether the requirement for each officer, director, general partner or manager to appear in person is unconstitutionally burdensome. Plaintiffs rely on two Seventh Circuit decisions, neither of which directly addresses the issue at hand. *Schultz v. City of Cumberland* invalidated certain portions of adult entertainment licensing provisions pertaining to employee and owner disclosures, because the court found them "redundant and unnecessary for Cumberland's stated purposes." 228 F.3d 831, 852 (7th Cir.2000). In addition, *Genusa v. City of Peoria* invalidated a licensing provision which required each person with an ownership interest in an adult entertainment business to file a separate license application. 619 F.2d 1203, 1216–17 (7th Cir.1980). The court found the purpose of the ordinance, enforcement of zoning provisions, did not support this requirement, and the purpose could be accomplished by one application filed on behalf of the business entity. *Id.* In this case, the ordinance does not require business owners to file separate applications, unless they also fall within the definition of "employee." It expressly provides for filing of one establishment application signed by all the owners. The issue is whether it is constitutionally permissible to require all the owners to appear in person at the Sheriff's office to file the establishment application.

As with any time, place, and manner restriction, it must be narrowly tailored to serve a substantial government interest. *Renton*, 475 U.S. at 50–52, 106 S.Ct. 925; *see also Kev*, 793 F.2d at 1060 (finding the license requirements served valid governmental purposes). In addition to the governmental interests the County intended to address, preventing minors and those who have recently been convicted of certain crimes from working on the premises, facilitating the identification of potential witnesses or suspects, and curtailing the spread of sexually-transmitted diseases (*see* LR, 142–45 [Ordinance No. 9479, § 21.1801(B)(1)-(25)]), the County also stated the purpose for the licensing provision itself:

Adult Entertainment Establishments have operational characteristics that should be reasonably regulated in order to protect . . . substantial governmental concerns, A reasonable licensing procedure is an appropriate mechanism to place the burden of that reasonable regulation on the owners and the operators of the adult entertainment establishments. Further, such a licensing procedure will give an incentive on [*sic*] the operators to see that the adult entertainment establishment is run in a manner consistent with the health, safety and welfare of its patrons and employees, as well as the citizens of the County. It is appropriate to require reasonable assurances that the licensee is the actual operator of the adult entertainment establishment, in ultimate possession and control if the premises and activities occurring therein.

(*Id.* at 144 [§. 21.1801(B)(17) & (18) ].)

It is not clear how the requirement that each officer, director, general partner or manager appear in person to file the application advances the stated substantial government interests. The County offered no explanation. Since prior restraints are presumptively unconstitutional, *Clark,* 259 F.3d at 1005, the Court finds the County failed to present sufficient evidence to meet its burden in opposition to plaintiffs' summary judgment motion or in support of its own cross-motion with respect to this issue.

As to each officer, director, general partner or manager who falls under the definition of "employee," plaintiffs also contend it is unduly burdensome and redundant to require each to apply for an employee license, as well as collectively for an establishment license. The County contends plaintiffs' interpretation of the ordinance is not supported by a fair reading of the ordinance because the eligibility requirements for the two licenses are identical,

and each officer, director, general partner or manager listed on the establishment license application is considered a "licensee."

While the employee license application does not call for any additional type of information than the establishment license application (*see* LR, at 144 [Ordinance No. 9479, § 21.1803(D) ] ), the amended ordinance clearly requires all persons falling within the definition of "employee" to obtain an employee license:

It shall be unlawful for any person to be an employee as defined in this Chapter, [*sic*] of an adult entertainment establishment in the County of San Diego without a valid adult entertainment establishment employee license.

(*Id.* at 149 [§ 21.1803(B) ].) The fact an officer, director, general partner or manager is considered a "licensee" when an establishment license is issued to the business entity provides no relief, because the definition of "licensee" distinguishes between establishment and employee licensees:

"Licensee" shall mean . . . the individual or individuals listed as an applicant on the application for a[n] adult entertainment establishment license. In case of an "employee," it shall mean the person in whose name the adult entertainment establishment employee license has been issued.

(*Id.* at 147 [§ 21.1802(F) ] (emphasis added).)

Based on the express language of the ordinance, when the adult entertainment establishment is a business entity, each of its officers, directors, general partners or managers who falls within the definition of "employee" is required to sign the establishment application and submit a separate employee application. Since an employee license application calls for less information than an establishment license applica-

tion (*see* LR, at 150 [Ordinance No. 9479, § 21.1803(D) ] ), the requirement to file an employee application is redundant. In addition, it provides another avenue to require each officer, director, general partner or manager who is an employee to appear in person at the Sheriff's office. (*Id.* at 149 [§ 21.1803(C) ].) As discussed above, the stated purposes for the licensing provisions do not support this requirement.

Plaintiffs next contend the amended ordinance is not narrowly tailored because it "indiscriminately" requires every employee, whether they be a bartender, waitress, door host, parking valet, janitor or accounting clerk, to be licensed. The ordinance, however, is not "indiscriminate." It exempts from the licensing requirement persons who do not perform services on the premises and "person[s] exclusively on the premises for repair or maintenance of the premises or for the delivery of goods to the premises." (LR, at 146 [Ordinance No. 9479, § 21.1802(C) ].) Requiring the remaining employees, who "perform[ ] any service on the premises of an adult entertainment establishment" (*id.*), to obtain a license is substantially related to the governmental interests the County intended to address. (*See* LR, at 142–45 [Ordinance No. 9479, § 21.1801(B)(1)-(25) ].) Furthermore, the County is not required to establish the means it has chosen to address the secondary effects is the least restrictive or the most effective. A time, place, and manner regulation is considered narrowly tailored if the government shows it "serve[s] a substantial government interest," and affects that category of businesses which produce the secondary effects. *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925. Based on the foregoing, plaintiffs' argument fails as a matter of law because it is contradicted by the plain language of the ordinance.

Last, plaintiffs argue the licensing provisions are unduly burdensome because, in addition to the employee license, the amended ordinance requires each manager working on the premises and each performer to file a registration form with the Sheriff's office before beginning work. (LR, at 170–71 [Ordinance No. 9479, §§ 21.284.9, 21.285.1, 21.285.3].) According to plaintiffs, as a part of the registration process, the employees also provide their photographs and fingerprints. Requiring fingerprints and photographs is reasonably related to the substantial governmental interest of preventing crime. *See Deja Vu of Nashville v. Metro. Gov't of Nashville,* 274 F.3d 377, 393–95 (6th Cir.2001). This is one of the stated purposes of the amended ordinance. (LR, at 142 [Ordinance No. 9479, § 21.1802(B)(5), (21)-(24) ].) Furthermore, the County made specific findings pertaining to performers and on-site managers which support the registration requirement:

> Certain employees of unregulated adult entertainment establishments defined in this ordinance as adult cabarets engage in higher incidence of certain types of illicit sexual behavior than employees of other establishments.

> \* \* \* \* \* \*

> The disclosure of certain information by those persons ultimately responsible for day-to-day operation and maintenance of the adult entertainment establishment, where such information is substantially related to the significant governmental interest in the operation of such uses, will aid in preventing the spread of sexually transmitted [*sic* ] diseases and will prevent the further secondary effects of crime, blight, and dissemination of illegal obscenity, child pornography, and to minors, materials harmful to them.

(*Id.* at 145 [§ 21.1801(B)(2) & (21) ].) The registration requirement is therefore per-

missible on its face. As to the burden of filing a registration and an employee license application, nothing precludes the performers and on-site managers from filing both at the same time. (*See id.* at 149, 170–71 [§§ 21.1803, 21.284.9, 21.285.1].) Since the requirement is narrowly tailored to advance a substantial government interest, and the burden is *de minimis*, the Court finds the requirement of filing a license application and registration would not make it more difficult to obtain a license so as to unreasonably diminish the inclination to apply. *See Kev,* 793 F.2d at 1060. The Court therefore finds plaintiffs failed to meet their burden as the moving party for summary judgment and in opposition to the County's cross-motion with respect to this issue.

In sum, the Court finds the licensing and registration requirements are narrowly tailored with the following two exceptions: (1) subsection (C) and (F) of section 21.1803 are not narrowly tailored to the extent they require each "officer, director, general partner, or other person who will manage or participate directly in the decisions relating to management and control of the business" to appear in person at the Sheriff's office to file the establishment license application; and (2) subsection (B) of section 21.1803 is not narrowly tailored to the extent it requires the same category of individuals to also apply for an employee license, if they are employees as the term is defined in the ordinance.

None of the parties addresses severability of the offending provisions. Ordinance No. 9479 contains a severability clause. (LR, at 165 [§ 21.1826].) In addition, based on the Legislative Record and review of the affected ordinance, the Court finds the remainder of the ordinance, including the extensive substantive provisions and the non-offending licensing and registration provisions, is sufficiently complete in itself, and the County likely would have adopted the amended ordinance, even if it had foreseen some of its license application provisions would be invalidated. *See Barlow,* 72 Cal.App.4th at 1264, 85 Cal.Rptr.2d 752; *see also Kev,* 793 F.2d at 1060 n. 7. The Court therefore finds the unconstitutional portions of the licensing provision are severable, and therefore does not strike the ordinance in its entirety.

### 2. Narrowly Tailored—Disclosure of Personal Information

In addition, plaintiffs argue the County's new licensing requirements are unconstitutional because they require applicants to reveal certain personal information which may potentially be available to the public under California law, and therefore have a "chilling effect" on protected speech. The ordinance requires license applicants to disclose the following:

1. The applicant's full true name and any other names or aliases used in the preceding five (5) years.

2. Current business address or another mailing address of the applicant.

3. Written proof of age, in the form of a birth certificate or driver's license or other picture identification document issued by a governmental agency.

4. If the application is for an adult entertainment establishment license, the establishment name, location, legal description, mailing address and telephone number (if one currently exists) of the proposed adult entertainment establishment.

5. If the application is for an adult entertainment establishment license, the name and address of the statutory agent or other agent authorized to receive service of process.

6. A statement whether the applicant has been convicted or has pled guilty or nolo contendere to a specified

criminal activity as defined in this ordinance, and, if so, the specified criminal activity involved, the date, place, and jurisdiction of each.

(LR, at 150 [Ordinance No. 9479, § 21.1803(D) ].)

Plaintiffs' "assertion that requiring disclosure of information regarding names, addresses, and telephone numbers to the county violates the First Amendment is essentially foreclosed by [the] decision in *Kev*." *See Dream Palace*, 384 F.3d at 1010. *Kev* upheld a licensing provision requiring entertainers to provide their name, address, phone number, birth date, and aliases, past and present, and business name and address where they intended to perform. 793 F.2d at 1059. The court found the required disclosures would not "discourage . . . a prospective dancer from performing" and did not "inhibit[ ] the ability or the inclination to engage in the protected expression." *Id.* at 1060; *see also Dream Palace*, 384 F.3d at 1010 (upholding licensing provision requiring disclosure of full true name, stage names, current residential address, and telephone number).[18]

However, *Dream Palace* granted the plaintiff's request for an injunction prohibiting the government from disclosing to the public pursuant to the state public record laws personal information such as residential addresses and telephone numbers because such information could be used by "aggressive suitors and overzealous opponents" to trace entertainers to their homes, causing them to choose not to apply for a permit or to engage in protected speech out of concern for their personal

safety. 384 F.3d at 1012. The Ninth Circuit noted "[t]he chilling effect on those wishing to engage in First Amendment activity is obvious." *Id.*

The instant case, however, differs in a significant respect from *Dream Palace*. Nothing in the ordinance requires applicants to disclose their home address or telephone number, thus precluding the risk of aggressive suitors or overzealous opponents tracing them to their homes. Plaintiffs point to no other risk which could dissuade individuals from applying for a license.

With respect to the required disclosure of certain personal information to obtain a license, the Court finds plaintiffs failed to meet their burden in opposition to the County's summary judgment or in support of their cross-motion. Based on the foregoing, the Court does not reach the issue whether licensing information is available to the public under California law.

### C. Procedural Safeguards

■■■ In its summary judgment motion the County contends the licensing provisions of the amended ordinance provide the procedural safeguards required by *FW/PBS*. To be constitutional, licensing provisions may not place "unbridled discretion in the hands of a government official or agency," "the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained," and "there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *Id.* at

**18.** Plaintiffs rely largely on *Schultz*, where the Seventh Circuit invalidated that portion of licensing requirements which called for disclosure of a residential address, recent color photograph, Social Security number, fingerprints, tax-identification number and driver's license information. 228 F.3d at 852. The

Ninth Circuit, however, does not follow *Schultz* in this regard. In finding a similar licensing provision constitutional, *Dream Palace* acknowledged the Seventh Circuit's decision in *Schultz* was to the contrary. *See* 384 F.3d at 1010 n. 14. The Court therefore declines plaintiffs' invitation to follow *Schultz*.

225, 228, 110 S.Ct. 596. Although plaintiffs acknowledge this standard in their opposition to the County's motion and in support of their cross-motion, they do not contend the licensing provisions fail to satisfy it.[19]

Under the County's licensing scheme, a license application may be denied based only on objective criteria: if an applicant is less than eighteen years of age, fails to provide certain information or falsely answers a question, has not paid the fee, was convicted of certain specified crimes, or the adult entertainment premises fail to meet interior configuration or zoning requirements of the ordinance. (LR, at 151–52 [Ordinance 9479, § 21.1804(A)(1)-(5) ].) These requirements do not provide much discretion for denial of the license. Upon receipt of the application, a temporary license is immediately issued until the application is granted or denied. (*Id.* at 151.) This ensures the *status quo* remains pending the decision. The decision must be made within thirty days, at which time the applicant can immediately seek judicial review or appeal the decision to the County Hearing Officer. (*Id.* at 152, 163 [§§ 21.1804(B), 21.1824].) While review is pending, the applicant may continue to operate with a provisional license. (*Id.* at 164 [§ 21.1824].) Based on the review of the pertinent licensing provisions and lack of opposition from plaintiffs, the Court finds the County met its burden as the moving party for summary judgment with respect to this issue.

### Conclusion

Based on the foregoing, plaintiffs' Joint Motion for Summary Judgement is **GRANTED IN PART AND DENIED IN PART**, and defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART** as specified below.

*As to Fantasyland Video, Inc. v. County of San Diego, case no. 02cv1909 LAB (RBB):*

1. Fantasyland's motion for summary judgment with respect to its First Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "Licensing Requirement" of Ordinance No. 9479 (as amended) is **GRANTED** to the extent the Court finds unconstitutional certain licensing and registration provisions of section 21.1803(B), (C) and (F).

Specifically, the Court finds: (1) subsections (C) and (F) are not narrowly tailored to the extent they require each "officer, director, general partner, or other person who will manage or participate directly in the decisions relating to management and control of the business" to appear in person at the Sheriff's office to file an adult entertainment establishment license application; and (2) subsection (B) is not narrowly tailored to the extent it requires the same category of individuals to also apply for an adult entertainment establishment employee license, if they are employees as the term is defined in the ordinance. The Court further finds these provisions severable from the remainder of the ordinance.

Accordingly, the County is **ENJOINED** from requiring each "officer, director, general partner, or other person who will manage or participate directly in the decisions relating to management and control of the business" to appear in person at the Sheriff's office to file an adult entertainment establishment license application. The County is further **ENJOINED** from requiring the same category of individuals

---

**19.** To the extent plaintiffs intended this motion to challenge the procedural safeguards in their papers, they have waived this issue by failing to discuss it. *See Indep. Towers*, 350 F.3d at 929.

to also apply for an adult entertainment establishment employee license, if they are employees as the term is defined in the ordinance.

In all other respects, Fantasyland's summary judgment motion with respect to its First Claim for Relief is **DENIED**, and the County's summary judgment motion with respect to the same claim is **GRANTED**.

2. Fantasyland's motion for summary judgment with respect to its Second Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "Hours of Operation Requirement" of Ordinance No. 9479 (as amended) is **DENIED**, and the County's summary judgment motion on the same claim is **GRANTED**.

3. Fantasyland's motion for summary judgment with respect to its Third Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "Interior Configuration Regulations" of the Ordinance No. 9479 (as amended) is **DENIED**, and the County's summary judgment motion on the same claim is **GRANTED**.

4. Judgment has been entered on December 6, 2002 as to all remaining claims in this case. Clerk of Court is therefore directed to **ENTER FINAL JUDGMENT** in case no. 02cv1909 LAB (RBB).

*As to Tollis, Inc. et al. v. County of San Diego, case no. 02cv2023 LAB (RBB)*

1. Deja Vu's motion for summary judgment with respect to its First Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "License Requirements" of Ordinance No. 9479 (as amended) is **GRANTED** to the extent the Court finds unconstitutional certain licensing and registration provisions of section 21.1803(B), (C) and (F).

Specifically, the Court finds: (1) subsections (C) and (F) are not narrowly tailored to the extent they require each "officer,

director, general partner, or other person who will manage or participate directly in the decisions relating to management and control of the business" to appear in person at the Sheriff's office to file an adult entertainment establishment license application; and (2) subsection (B) is not narrowly tailored to the extent it requires the same category of individuals to also apply for an adult entertainment establishment employee license, if they are employees as the term is defined in the ordinance. The Court further finds these provisions severable from the remainder of the ordinance.

Accordingly, the County is **ENJOINED** from requiring each "officer, director, general partner, or other person who will manage or participate directly in the decisions relating to management and control of the business" to appear in person at the Sheriff's office to file an adult entertainment establishment license application. The County is further **ENJOINED** from requiring the same category of individuals to also apply for an adult entertainment establishment employee license, if they are employees as the term is defined in the ordinance.

In all other respects, Deja Vu's summary judgment motion with respect to its First Claim for Relief is **DENIED**, and the County's summary judgment motion with respect to the same claim is **GRANTED**.

2. Deja Vu's motion for summary judgment with respect to its Second Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "Hours of Operation Requirement" of Ordinance No. 9479 (as amended) is **DENIED**, and the County's summary judgment motion on the same claim is **GRANTED**.

3. Deja Vu's motion for summary judgment with respect to its Third Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "Performance Restrictions" of Ordinance No. 9479

(as amended) is **DENIED**, and the County's summary judgment motion on the same claim is.

4. Deja Vu's motion for summary judgment with respect to its Fourth Claim for Relief for declaratory and injunctive relief to prevent enforcement of the "Zoning Amendment" of Ordinance No. 9469 (as amended) is **GRANTED** to the extent the Court finds unconstitutional certain procedural provisions of sections 6930(b)(1) and 7064.

Specifically, the Court finds sections 6930(b)(1) and 7064 fail to provide for procedural safeguards required by the First Amendment to the extent they allow for excessive time to make a decision whether to grant an administrative permit application. The Court further finds these provisions severable from the remainder of the ordinance.

In all other respects, Deja Vu's summary judgment motion with respect to its Fourth Claim for Relief is **DENIED,** and the County's summary judgment motion with respect to the same claim is **GRANTED.**

5. In its Fifth Claim Alternative Relief for declaratory and injunctive relief to prevent enforcement of the "Zoning Amendment" Deja Vu alleges Ordinance No. 9469 (as amended) constitutes regulatory taking on the grounds it does not substantially advance legitimate state interests. Deja Vu is hereby **ORDERED TO SHOW CAUSE** why its Fifth Claim Alternative Relief should not be adjudicated in the same manner as its Fourth Claim for Relief. No later than *July 5, 2005*, Deja Vu shall file a memorandum of points and authorities not to exceed five pages in length and supporting evidence, if any, in response to this order to show cause. The County shall file a responsive memorandum of points and authorities no more than five pages in length and any supporting evidence no later than *July 18, 2005.*

Upon filing of the foregoing, the parties shall await further order of the Court.

**IT IS SO ORDERED.**